**STATE of Minnesota, Respondent,**

v.

**Dallas THOMPSON, Appellant.**

No. C8–97–272.

Supreme Court of Minnesota.

May 14, 1998.

Rehearing Denied June 17, 1998.

735

Melissa Sheridan, Asst. State Public Defender, for appellant.

Hubert H. Humphrey III, Atty. General, for respondent.

Robert M.A. Johnson, Anoka Cty. Atty., Marcy S. Crain, Asst. Cty. Atty., for respondent.

## OPINION

STRINGER, Justice.

Appellant was convicted of first-degree murder for the shooting deaths of appellant's former girlfriend and her mother. Appellant claimed that his Fourth Amendment right to be free from unreasonable search and seizure was violated when the police entered a friend's apartment in which he was staying overnight and arrested him without a warrant or verifying that there was an existing warrant for his arrest on an unrelated matter. He also claimed that he was deprived of a fair trial when the trial court admitted in evidence a video tape in which appellant spoke of a "4 man hit list," his intention to "kill people," and expressed his distrust of and animosity toward "girls." The video tape also included references to illegal drug activity. Finally, appellant claimed that his right to a fair trial was violated by prosecutorial misconduct because, in opening and closing arguments, the prosecutor speculated as to what might have happened before the murders, invited the jurors to put themselves in the victim's shoes, compared appellant to O.J. Simpson, and disparaged the defense. After a careful review of the record we conclude that the conviction of appellant should in all respects be affirmed.

Just prior to 5:00 a.m. on November 2, 1995, 20-year-old appellant shot and killed his 16-year-old former girlfriend, Michelle Eardley ("M.Eardley"), and her mother, 42-year-old Susan Eardley ("S.Eardley"), in their split-level home located at 4185 Austin Street Northeast in Blaine, Minnesota. At 4:55 that morning, the Anoka County Central Communications Center received a 911 call from the Eardley residence but the call was disconnected and the message was unintelligible. Two Blaine police officers arrived at the residence to investigate the 911 call shortly after 5:00 a.m. The officers noticed that a screen had been pried away from a window on the north side of the house and the front door was slightly opened. The officers knocked on the door and identified themselves as police. When there was no response, they entered the home. They immediately smelled burned gun powder and found M. Eardley's body lying in the upstairs hallway outside a bedroom door. She had been shot once in the forehead. S. Eardley's body also was found upstairs on a bedroom floor. She had been shot in the neck, the bullet travelling through her chest and out her back. Both shots were delivered by a .44 caliber rifle fired from within a distance of one foot. Additional police and an ambulance were summoned.

Further investigation by the Anoka County Sheriff's Office disclosed that outside the Eardley residence the screen for M. Eardley's lower level bedroom window had been cut and pried back, and the glass was broken, a knife and sheath had been left on an air-conditioner located outside the window, there were footprints in the snow in that area, and there were two bullet holes in the siding outside of an upper level bedroom. Inside the residence, the investigation disclosed drops of blood in the basement stairwell, blood and tissue fragments on the bathroom floor, blood splatter, tissue and clumps of hair on the bedroom wall, three spent .44 Remington magnum shell casings, one outside the bedroom door where M. Eardley's body was found, one inside S. Eardley's bedroom, and one on top of the bed. A deformed, spent bullet was found on an end table, two bullet holes were found in the bedroom walls, the bedroom telephone had been disconnected, and there was blood on the wall jack.

Meanwhile, in northeast Minneapolis, at about 5:40 a.m., a Minneapolis police officer on routine patrol observed two men standing at a pay phone at the intersection of Central Avenue Northeast and 26th Avenue. When the officer made eye contact with the men, one of them, wearing a Michigan Wolverines jacket and a Wolverines hat, ran away. He was later identified as appellant. The other man walked briskly in another direction. When the officer stopped the man and frisked him, he identified himself to the officer as Christopher DiLaura. He was not carrying any identification. In response to questioning, DiLaura told the officer his friend's name was Dallas Thompson, and that he ran away because there were some outstanding warrants for his arrest.[1] DiLaura told the officer that he, his girlfriend

---

1. At trial, the officer testified that DiLaura "said that [appellant] fled because he had some out-

Kerry Cronin, and appellant were staying with a friend Christina Lopez, at 2620 Quincy Street Northeast,[2] and that his girlfriend could verify his identity. A second officer arrived in response to a call for assistance and searched the area for appellant. The search was unsuccessful, so both officers accompanied DiLaura to Lopez's apartment to confirm DiLaura's identity and to look further for appellant.

When they arrived at 2620 Quincy Street Northeast, the officers knocked on the exterior door to the stairway leading to the upstairs apartment unit and a young man of approximately 18 years of age answered. To the officer's question whether the young man lived there, he replied that he did not. The officer told him that he needed to speak to the renter and to Kerry Cronin. The young man let the officers in and led them up the stairs. There was an open door at the top of the stairs leading into the apartment through the kitchen area. The officers went into the kitchen with the young man and inquired whether the young man knew appellant and if he was there. The young man answered no to both questions. When the officer again asked to speak to the renter, the young man pointed to a bedroom inside the apartment— the bedroom of Christina Lopez. The officer stood outside the bedroom door and asked Lopez if she knew appellant and if he was there. She said that she did not know him. Because the officer saw a Wolverines jacket on the couch, he did not believe that appellant was not there.

The officer then asked to speak to Cronin and a woman from a second bedroom responded. The officer asked her if appellant was there—Cronin replied that she did not know him and that he was not there. The officer walked to her bedroom door and asked her to come out so he could talk to her. She got out of bed, and as she approached, he looked inside the doorway and saw a figure standing against the wall with his arms outstretched. To the officer's query,

"Dallas?" there was a response, "Yeah." The officer then walked into the bedroom, placed appellant in an escort hold and took him outside to the squad car.

In the squad car appellant told the officer his name and date of birth. The second officer checked with the radio dispatcher for warrants on appellant and discovered two: one for a minor in consumption and the other for an open bottle violation. After confirming the warrants over the police radio, the officer formally placed appellant under arrest, handcuffed him, and took him to the Hennepin County jail. Because the officer smelled alcohol on appellant's breath and he was 20-years-old at the time, he was arrested for minor in consumption as well as the two outstanding warrants. At the jail, the officer noticed that appellant had blood on his pant leg.

Back at the crime scene, the investigating officers had learned that Blaine police officers had been called to the Eardley residence on earlier occasions to investigate domestic disturbances between appellant and M. Eardley. When the investigating officers called to see if there were any arrest warrants out for appellant, they discovered that appellant had been picked up by the Minneapolis police and was being held in Hennepin County jail. The lead investigator telephoned the officer who arrested appellant, told him that appellant was a suspect in a double homicide, and asked the officer if appellant had any blood on him. The officer replied that he had noticed blood on appellant's clothing. Shortly thereafter, another Anoka County investigator went to see appellant in jail and discovered that he had fresh cuts on his leg, cuts and scrapes on his hands, and a scrape on his back. A search of 2620 Quincy Street Northeast was conducted that morning pursuant to a warrant and disclosed several pieces of evidence, including a Wolverines jacket, a garbage bag containing a bloody paper towel and a pair of black nylon jogging pants that were torn in front

---

standing warrants out for his arrest." In the omnibus hearing, the officer testified that DiLaura "said his friend ran because he was scared and that possibly he had some warrants out for his arrest." DiLaura testified at trial that he told the officer, "I think he's got a couple warrants. That's the only thing I can think of."

2. 2620 Quincy Street Northeast is an older home that has been converted into a duplex with one apartment unit upstairs and another below.

and in back and stained with blood. The search also disclosed a Ruger .44 caliber magnum semi-automatic rifle with a scope hidden behind the living room couch. The police seized the evidence and Cronin's 1981 Chevrolet Malibu, parked behind the duplex, because it had blood on the outside of the driver's door window and inside on the seat, head rest, steering wheel, turn signal lever, seat belt, and headlight switch.

Testing by the Bureau of Criminal Apprehension revealed that the rifle seized from the apartment fired the casings found at the Eardley residence, that blood found at the residence matched appellant's as did the blood on the paper towel, the steering wheel, the turn signal, and the seat belt. It also matched blood found on the Wolverines jacket and jogging pants to appellant's with a random match possibility ratio of 5,000,000:1. Blood on the jogging pants and appellant's tennis shoes matched M. Eardley's with a random match possibility ratio of 21,000,-000:1, and blood on appellant's T-shirt and the bedroom phone jack matched S. Eardley's with a random match possibility ratio of 505,000,000:1. Glass fragments found in the jogging pants were determined to be compatible with the broken window at the Eardley residence. A palmprint on the outside of the broken window and a fingerprint on the inside of the front door at the Eardley residence were determined to be appellant's. The footprints found in the snow outside the Eardley residence did not match the soles of appellant's shoes, however.

At trial, the state introduced testimony of several witnesses regarding prior altercations between appellant and M. Eardley. S. Eardley's boyfriend, Charles Wilson, testified that appellant and M. Eardley began dating in late December 1994, and that appellant moved in with the Eardleys by late March 1995. Appellant moved out when S. Eardley asked him to leave in June or July of 1995. Later that July, so Wilson testified, appellant kicked in the Eardley's front door when M. Eardley refused to allow him to come inside.

M. Eardley's co-workers at Pizzaman Restaurant also testified regarding several arguments that appellant and M. Eardley had at the restaurant during the summer of 1995. The restaurant manager testified that in one of those arguments appellant told M. Eardley that he would "kick [her] ass" if she did not come with him.

By August 1995, appellant had moved back in with the Eardleys but again, within a month or two, S. Eardley asked him to move out. That September appellant and M. Eardley got into a fist fight at a party. M. Eardley kicked and pushed appellant and he punched her in the face several times and knocked her to the ground. On October 20, 1995, S. Eardley called the Blaine police to report an altercation between appellant and M. Eardley despite their relationship having ended earlier.

Near the end of October 1995, appellant made several threats to kill M. Eardley. He told one friend, Corey James, that "life doesn't mean much to him anymore, and if he can't have [M. Eardley], nobody would, and that's why he was going to shoot her." Appellant made similar threats to kill M. Eardley to four other friends who testified regarding those threats at appellant's trial. There was testimony that appellant was angry and yelling into the phone that M. Eardley was "a bitch and a whore," that appellant was convinced that M. Eardley had a boyfriend and that he "kept saying that she was fucking him over, [and] that if he found out that * * * [M. Eardley] was seeing anybody or that she had a boyfriend, that he would kill her." Further testimony revealed that appellant said more than once, and possibly as many as four or five times, that he was going to kill M. Eardley, and that he would shoot her. There was also testimony that appellant said "that he wanted to kill [M. Eardley]. He wanted to shoot her," then appellant told the witness to "listen up," after which the witness heard a click which sounded to him like a clip going into a gun. DiLaura testified that regarding M. Eardley, appellant said that he was "going to do her like O.J.," that he was "going to blast her," and that appellant said, "I hate that bitch. I'm going to kill that bitch one of these days. She don't deserve to live." DiLaura also testified that appellant said he had a ".44 with a scope for someone's ass."

The video tape[3] made in October 1995 by

---

**3.** Pre-trial, appellant moved to exclude the "hit

list" video tape on grounds of relevancy, unfair

Troy Ferrence, an acquaintance of appellant and M. Eardley, was admitted in evidence over appellant's objection. In the tape appellant's voice was audible describing a red-dot laser scope with which "you could get someone right between the eyes," that he had a "4 man hit list" and that he was "killing people tonight * * * [t]here is the evidence tape." The video tape also contained statements by appellant regarding his animosity toward "girls,"[4] and a reference to smoking some "weed" and the purchase of another illegal drug, "angel dust," from "[s]omeone Dallas knows."

Three of appellant's friends, Cronin, Lopez, and DiLaura, testified regarding events that occurred during the evening of November 1, 1995, just prior to the homicides. All three witnesses testified that they went with appellant to a video arcade and returned to Lopez's apartment between 9:00 and 10:00 p.m. to watch some movies, and that they had seen appellant playing with the knife that was later discovered on the air conditioner outside the Eardley's home. DiLaura testified that he and appellant got drunk by drinking beer, and DiLaura and Lopez testified that appellant left the apartment at 3:30 a.m. wearing Lopez's Wolverines jacket, a Wolverines hat, black jogging pants and a blue T-shirt.[5] DiLaura testified that when appellant left, he told DiLaura that "he was going to go hunting."

As to later events, DiLaura testified that at 5:30 that morning appellant returned to Lopez's apartment, awoke DiLaura and told him that he "just killed [M. Eardley] and I think I killed her mom too." DiLaura testified that appellant said that he "blasted [M. Eardley]. Blew her head off," that he thought he shot S. Eardley in the neck, and

after appellant said these things to him, appellant went into the bathroom to wash the blood off. According to DiLaura's testimony, appellant then asked him to walk with him to a pay phone so he could call his mother, but before they left, appellant took off the bloody jogging pants and put on a pair of jeans. DiLaura later saw the jogging pants in the garbage can. DiLaura also testified that on the way to the pay phone appellant told him that he could not believe that he did it, and asked him what he should do. Appellant was not successful in reaching his mother from the pay phone on the corner of 26th Avenue and Central Avenue Northeast and when the police officer drove by, appellant ran away.

Finally, the state introduced the testimony of Detention Deputy Timothy Howe who was working in the Anoka County jail on March 8, 1996, when he overheard a conversation between appellant and two other inmates. Howe testified that appellant said, "Yeah, I killed them. What does it matter if I do 40 or 80 years?"

In his defense appellant introduced the testimony of Detention Deputy Donald Wilson who testified that he also overheard appellant's remarks to the other inmates, but that he considered them to be bragging. Appellant did not testify.

The jury found appellant guilty of two counts of first-degree premeditated murder and two counts of first-degree felony murder in the deaths of M. Eardley and S. Eardley. Appellant was sentenced to two consecutive life terms.

We first address appellant's claim that the search of the Lopez apartment and his subsequent arrest were unlawful because they were warrantless, citing Minn.Stat. § 629.32 (1996)[6] and the Fourth Amendment of the

---

prejudice, and lack of foundation due to the fact that the tape had been edited.

4. Appellant said, "Guys is trustworthy, man. But girls, man, shit. I swear to God man. I swear to God. Every girl man. I could bend them mother fuckers over up and throw 'em and kick 'em and throw them right out the fuckin' window straight to the curb man. Bonus. * * * * Every girl. Y'all stick together. Y'all the same. A bunch of shyster, 2–faced, lying * * * * 2–faced, hype everything, stick up for each other. No tellin' the truth. fuckin stainless assholes. Everyday running around with * * * ."

5. Lopez testified that the jogging pants were black or dark blue, but did not specify the color of the T-shirt.

6. Section 629.32 of Minnesota Statutes (1996) provides:

A peace officer making an arrest may not subject the person arrested to any more restraint than is necessary for the arrest and detention. The peace officer shall inform the defendant that the officer is acting under a warrant, and shall show the defendant the warrant if requested to do so. An arrest by a peace officer acting under a warrant is lawful even though

United States Constitution. The state argued the officers' entry into the apartment was with the consent of someone having apparent authority and that the search and seizure were valid because the officers had probable cause to believe a valid arrest warrant for appellant's arrest existed, and a warrant did in fact exist.

For purposes of the Fourth Amendment's prohibition against unreasonable searches and seizures, "[a] warrantless, nonconsensual intrusion of one's dwelling * * * is considered presumptively unreasonable." *State v. Olson,* 436 N.W.2d 92, 98 (Minn.1989), *aff'd,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). *See* U.S. Const. amend. IV; Minn. Const. Art. 1, § 10. *See also Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 1375, 63 L.Ed.2d 639 (1980) (holding the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest"). As a preliminary matter, since appellant was an overnight guest in the Lopez residence, he has standing to challenge the police search of the Lopez dwelling. *See Minnesota v. Olson,* 495 U.S. at 98–100, 110 S.Ct. at 1689–90. Absent a warrant or an exception to the warrant requirement, the officers could not lawfully enter Lopez's apartment to search for and arrest appellant.

The state contends that the entry was consensual, however. Consent to entry is a well recognized exception to the warrant requirement. *State v. Hanley,* 363 N.W.2d 735, 738 (Minn.1985) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2044, 36 L.Ed.2d 854 (1973)). Valid consent for police entry of a dwelling may be given by a third party possessing common authority over the premises. *State v. Hummel,* 483 N.W.2d 68, 73 (Minn.1992). Where common authority does not actually exist, consent to entry is still valid where, under an objective standard, an officer reasonably believes the third party has authority over the premises and could give consent to enter. *Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990). Where the

consent involves a guest actually present inside the dwelling who merely invites the police into an area where visitors would normally be received, "[t]here is sound authority that, at least when the guest is more than a casual visitor and 'had the run of the house,' his lesser interest in the premises is sufficient to render that limited consent effective." 3 *Search and Seizure* section 8.5(e), at 801 (1996) (quoting *United States v. Turbyfill,* 525 F.2d 57 (8th Cir.1975)). Once inside the premises, the police conduct is limited by the scope of the consent given. *See Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297 (1991) (stating the standard for measuring the scope of consent is that of objective reasonableness).

Our initial inquiry then, is whether there was a sufficient objective basis for the officers to believe the person admitting them had authority to consent to their entry. We conclude there was. The young man answering the officers' knock on the door at approximately 6:00 in the morning was approximately 18 years of age. The officers did not ask the young man if they could enter the apartment to search for or arrest appellant, or to search for evidence of a crime; they simply stated that they needed to speak to the renter, Lopez, and to a guest of the renter, Cronin. With no words spoken they were led inside up the stairs and into the kitchen of the Lopez apartment. When the police inquired as to where they could find Lopez, the young man directed them to her bedroom. Even though the young man acknowledged he did not live there, he obviously was there in the early hours of the morning with the permission of someone in the building, he knew that Lopez was the renter and where she lived, and he appeared to be of sufficient age to appreciate the seriousness of the officers' presence and their request. Under the totality of the circumstances it was reasonable for the officers to believe that the young man who answered the door had the apparent authority to give them limited consent to enter the apartment for the purpose of talking with the occupants therein.

the officer does not have the warrant in hand at the time of the arrest, but if the arrested person so requests the warrant must be shown to that person as soon as possible and practica-

ble. A peace officer may lawfully arrest a person when advised by any other peace officer in the state that a warrant has been issued for that person.

The officers' entry of Lopez's apartment was therefore lawful.

■ Once lawfully inside the apartment, the officer saw the Wolverines jacket lying in plain view, and upon approaching the bedroom door where Cronin had been sleeping, the officer looked inside and saw appellant standing against the wall, in plain view, from a position in the apartment that was reasonable for the officer to be located. Therefore, even if the officer's purpose was to search for appellant, under the objective standard applied to determine the reasonableness of the officer's conduct for purposes of the Fourth Amendment, the officer did not stray outside the scope of the consent given. · See *Rodriguez*, 497 U.S. at 186, 110 S.Ct. at 2800 (concluding "determination of consent to enter must be judged against an objective standard") (citation omitted). Here the officer received permission to enter for the purpose of talking with Lopez and Cronin—precisely what he was doing when he saw appellant in plain view.

■ The predicate for appellant's subsequent arrest was the consensual entry coupled with the totality of circumstances leading up to his arrest. Information received from DiLaura and the officers' observations of appellant's behavior before and after the entry of the Lopez apartment provided them with a reasonable suspicion that there was a valid warrant existing for appellant's arrest and that he was in the room hiding and otherwise actively trying to avoid apprehension—reasonable suspicion sufficient to justify appellant's short detention pending confirmation of the existence of an outstanding warrant. See *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (holding that to justify detention of a criminal suspect the police officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"). In *Payton v. New York*, the United States Supreme Court held that the police may not enter a suspect's home for the purpose of making a routine felony arrest without a warrant because the Fourth Amendment implicates physical entry of the home as the principal evil. · *Payton*, 445 U.S. at 585, 100 S.Ct. at 1379. The purpose of the rule, however, "was not to protect the person of the suspect but to protect the home from entry." *Olson*, 495 U.S. at 95, 110 S.Ct. at 1687. Although police officers should verify the existence of a warrant where possible before entering a dwelling, where there is consent and the officers' conduct is otherwise based on a reasonable objective basis, the suspect's constitutional rights are not violated.

Our conclusion that the police officers had consent to enter the apartment, and their conduct did not exceed the scope of consent given, obviates the need to address whether the entry was justified under Minn.Stat. § 629.32, or whether the entry was justified because the officers had probable cause to believe an arrest warrant existed.[7]

■ We next turn to appellant's objection regarding introduction in evidence of what is referred to as the "hit list" video tape. At trial, over appellant's objection, the state introduced a video tape in which appellant's off-camera voice was heard describing a red-dot laser scope with which "you could get someone right between the eyes," saying that he had a "4 man hit list" and that he was "killing people tonight * * * [t]here is the evidence tape." The video tape also contained statements by appellant regarding his animosity toward "girls," and a reference by appellant's friends to smoking some "weed" and the purchase of another illegal drug, "angel dust," from "[s]omeone [appellant] knows."

Appellant argues the tape was irrelevant and therefore inadmissible. See Minn. R. Evid. 402. As we have stated on numerous occasions, a trial court has wide discretion in its evidentiary rulings and we will not reverse absent an abuse of discretion. *E.g.*, *State v. Byers*, 570 N.W.2d 487, 491 (Minn. 1997). In general, relevant evidence is evidence with any tendency to make the existence of a fact of consequence more or less likely to have occurred. Minn. R. Evid. 401.

---

7. At the omnibus hearing the trial court declined to address the issue of consent because the court found that the officer "had probable cause to believe that a valid arrest warrant existed for [appellant's] arrest."

It may be excluded however, even if relevant, if its prejudicial effect substantially outweighs it probative value. Minn. R. Evid. 403. In the video tape here, appellant describes at various times the murder weapon, his animosity toward "girls," and his intent to kill. The video tape obviously was highly probative of appellant's specific premeditated intent to murder his former girlfriend, M. Eardley, and her mother, S. Eardley, even though he does not mention them by name. Furthermore, the fact that it was made within two weeks prior to the murders, and describes the murder weapon actually used underscores its probative value. Its probative value is not substantially outweighed by its prejudicial impact, and the trial court did not abuse its discretion in admitting that evidence.

█ Finally, we turn to appellant's claim that he was denied a fair trial due to prosecutorial misconduct. The charges of misconduct fall into three categories; first, in inviting the jurors to place themselves in the victim's shoes when in closing argument the prosecutor argued, "[S. Eardley] was obviously awakened to probably one of the most terrible sights that any mother can see ... *your own daughter being killed right before your eyes.*" (Emphasis added). In *State v. Johnson,* we stated the general rule that "arguments that invite the jurors to put themselves in the shoes of the victim are considered improper." 324 N.W.2d 199, 202 (Minn.1982). The state concedes in its brief and at oral argument that it was misconduct for the prosecutor to invite the jurors to put themselves in the victim's shoes.

Second, appellant argues that the jury was improperly invited to speculate as to events occurring at the scene of the killings. The state concedes the point and acknowledges that the prosecutor engaged in speculation during opening and closing arguments and that "some of the speculation was improper * * *." In the opening statement, the prosecutor said,

He came through the bedroom. If [M. Eardley] had been sleeping here when he came through, *she probably was frightened out of her wits* and ran up to her mother. *The defendant continues tracking her through the bedroom with the rifle, through the family room/living room with*

*the rifle, up the stairs,* leaving, unbeknownst to him, the two spots of blood that the investigators found at the crime scene in the stairwell area. *And he continues hunting up each stair* until he comes to the hallway here. * * * *In the meantime [S. Eardley] was obviously awakened to probably one of the most terrible sights that any mother can see ... your own daughter being killed right before your eyes. She may have tried to protect herself, roll off the bed, something like that.* And this defendant stepped over [M. Eardley], walked over to this area and fired a second shot that went through the wall. * * * After he misses [S. Eardley], *he orders her to come out at gun point from the protection of the bed. She crawls out.* He's standing [in] this general area here, and he shoots her through the neck.

(Emphasis added).

It is clear that the underscored portions of the prosecutor's argument go well beyond simply drawing inferences from the evidence. *See State v. Wahlberg,* 296 N.W.2d 408, 419–20 (Minn.1980). Much of it is pure speculation having no factual basis. Similarly, in closing argument, the prosecutor engaged in the same sort of misconduct:

But she's still alive, *so he orders her to get down ... something along that line.* The [phone] line goes dead. *[S. Eardley] is still cowering on the floor by the bed* there. Our defendant is standing somewhere along the trajectory * * * * *He orders her to crawl out. She eventually does,* and he backs out from the bedroom, holding the rifle all this time. *And when she crawls* over to this area, he fires the second shot at her head area. This time getting her through the neck, and down she goes * * * * [T]he premeditation design arose as soon as [M. Eardley] was dead before his eyes, and [S. Eardley] had to be exterminated, slaughtered as well, because she's the eyewitness. *And if I have a eyewitness, I am not going to get off like O.J. did.*

(Emphasis added). The prosecutor's comments are particularly inappropriate in light of the trial court's order prohibiting witnesses from commenting on the state of mind

of the victims or their actions immediately preceding their deaths.

█ The third claim of prosecutorial misconduct relates to the prosecutor comparing appellant to O.J. Simpson. In the prosecutor's opening statement, he said, "friends will testify that they heard the [appellant] threaten to kill [M. Eardley]. That he made statements '[t]hat he was going to do [M. Eardley] like O.J.'" However, the references to O.J. Simpson were not only by the prosecution. DiLaura testified that appellant said he was "going to do her like O.J.," and therefore appellant's claim that to conclude that the prosecutor's reference to O.J. Simpson in the opening statement was misconduct seems thin at best. Reference to the O.J. Simpson matter came up again in closing argument when the prosecutor said:

> The defendant is telling his friends, * * * October of 1995, if I can't have her no one will. I am going to kill [M. Eardley]. Shoot her. Going to do her like O.J. And probably about this period of time, if you remember when the O.J. verdict was returned—that was in October of 1995—the defendant probably thought that he could get away with it too. * * * * I can't tell you * * * why on that particular day, that particular morning, he decided to follow through with all his threats. But this was going to be the time when he's going to do [M. Eardley] like O.J.

And later, regarding the element of premeditation for the death of S. Eardley, the prosecutor said the appellant was thinking, "if I have an eyewitness, I am not going to get off like O.J. did." The prosecutor continued, "And then when he got back at 5:30, he's a little worried at this point. Maybe I am not going to get off like O.J. did * * *." While comparing appellant's killing of M. Eardley to O.J. has at least some justifiable basis in DiLaura's testimony, the reference to the day of the O.J. verdict and appellant's worry about not "get[ting] off like O.J." has none. No purpose is served by comparing appellant to another charged with a notorious crime other than to attempt to impassion the jury, and clearly was prosecutorial misconduct. *See State v. Porter,* 526 N.W.2d 359, 363 (Minn.1995) ("prosecutor must avoid inflaming the jury's passions and prejudices against the defendant").

█ The state argues however that even though the prosecution admittedly engaged in misconduct, at least as to two of the three claims on appeal, it was harmless error. In a harmless error analysis we are guided by the principal that the error will be deemed harmless beyond a reasonable doubt "[i]f the verdict actually rendered was surely unattributable to the error * * *." *State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997) (quoting *State v. Jones,* 556 N.W.2d 903, 910 (Minn.1996)). Overwhelming evidence of guilt is a factor in determining whether the error complained of had no impact on the verdict, *id.* at 291, and where it is unreasonable to assume that the jury could have returned any verdict other than guilty, we will conclude the error was harmless. That is the situation here. We cannot reasonably conclude that the jurors relied on the prosecutor's inflammatory comments or speculation regarding premeditation of the killings. Although this court "will pay special attention to statements that may inflame or prejudice the jury where credibility is a central issue," *Porter,* 526 N.W.2d at 363, there was no issue of credibility here. *Cf. State v. Roberts,* 296 Minn. 347, 208 N.W.2d 744 (1973) (concluding important factor in jury verdict was whether they believed the defendant or the victim).

As a final note, it is difficult to understand why a prosecutor would engage in clear misconduct as is present in this case, particularly when the evidence of guilt is so overwhelming that a simple review of the facts substantiated by the evidence spins out a web of guilt more persuasive than anything that could be added through the prosecutor's inappropriate conduct. With the high risk of a new trial at stake, the gamble hardly seems worthwhile.

Affirmed.

GILBERT, J., took no part in the consideration or decision of this case.