*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1649**

State of Minnesota,
Respondent,

vs.

Joseph Alec Haefs,
Appellant.

**Filed September 29, 2014
Affirmed
Chutich, Judge
Dissenting, Ross, Judge**

Rice County District Court
File No. 66-CR-12-1877

Lori Swanson, Attorney General, St. Paul, Minnesota; and

G. Paul Beaumaster, Rice County Attorney, Terence Swihart, Assistant County Attorney, Faribault, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Lydia Villalva Lijó, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Halbrooks, Presiding Judge; Ross, Judge; and Chutich, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CHUTICH**, Judge

On appeal from his conviction of fifth-degree marijuana possession, appellant Joseph Haefs argues that the district court erred by denying his motion to suppress

evidence gathered from his home. He claims that the warrantless search was invalid because D.S. did not have the authority to consent to the search. Because we conclude that D.S. had actual authority to consent to the search, we affirm.

**FACTS**

At approximately 6:00 p.m. on May 22, 2012, Officer Matthew Kolling of the Faribault Police Department responded to a call for an escort at 1726 Grant Street. Before his arrival at the home, a police dispatcher informed him that other officers had responded to a domestic disturbance call at that address earlier in the day involving appellant Joseph Haefs and his girlfriend, D.S.

After arriving at the address, Officer Kolling saw D.S., who called for the escort, in front of the house picking up her clothing that had been thrown out on the curb and driveway. D.S. told Officer Kolling that she was moving out of the house, and she did not want to go into the house by herself because she was concerned for her safety. She told the officer that she wanted to get belongings for her child, clothing and toys, and clothing for herself so that she could move out.

D.S. further said that she had lived in the house with Haefs for more than a year, that she had moved in with Haefs after she became pregnant with his child, and that she had lived there with the child ever since. D.S. explained that she had never had a key to the house during the time she lived there because the windows and doors to the home were typically unlocked. When she returned home from work that day, however, the house was locked, which was unusual. When asked, D.S. said that she did not think a

2

lease existed for the house. She further volunteered to Officer Kolling that marijuana plants were in the basement of the house.

Officer Bryan Johnson also responded to the call for a protective escort. D.S. stated to Officer Kolling that she called Haefs when she first realized that she was locked out, and he said that he was not home. D.S. was unsure whether that assertion was true. Officer Johnson was not able to see inside the home to confirm whether or not Haefs was inside because all of the windows were covered.

Officer Kolling contacted Sergeant David Dillon, who arrived at the house at approximately 8:15 p.m. and spoke with D.S. in his police car. D.S. told Dillon she moved to the home in May 2011, lived in the home for more than a year, and received mail at the address. D.S. repeated to Sergeant Dillon that she wanted an escort inside the house because she was not certain that Haefs was gone and that she feared for her safety. She said that Haefs hit her during the domestic dispute earlier in the day. She explained that she told the responding officers that it had been only a verbal altercation so that Haefs would not be taken to jail. Sergeant Dillon then called Haefs on his cell phone. Haefs was upset and told the sergeant that he was not home, had to work soon, and did not want D.S. inside the house. The sergeant did not ask Haefs for his consent to enter the house.

Sergeant Dillon then told D.S. that he could not give her any advice on her situation. As he was speaking with her in the police car, she got out, stated that she wanted an escort into her home, and began walking toward the house. The officers followed her around the perimeter of the house as she attempted to find an open window

3

or door. When she was unable to find one, she attempted to remove a window screen. When this did not work, she broke a window to reach an interior lock, which she could not reach. Finally, she forced a door open by ramming it repeatedly with her shoulder. At no point did any officer order her to enter the home or assist her with gaining access.

Once she entered the home, D.S. asked the officers to escort her inside. Sergeant Dillon, who had previously encountered Haefs on police calls when Haefs was verbally aggressive toward the officers, decided that the officers should inspect the interior of the house to guarantee D.S.'s safety and remain with her while she gathered the child's and her belongings. Upon entering the house, all three officers immediately smelled the "strong odor" of fresh, growing marijuana.

Sergeant Dillon instructed the officers to go through the rooms of the house to verify that Haefs was not present. Eventually, Sergeant Dillon and Officer Kolling went to the basement, where they saw a washer and dryer by a closed door. D.S. came downstairs and, without saying a word to the officers, went over to the door and opened it. Inside the room, the officers saw a number of potted marijuana plants underneath lamps. Eventually, 14 marijuana plants were seized by the police officers, along with growing supplies also found in the room.

In July 2012, the state charged Haefs with fifth-degree drug possession. *See* Minn. Stat. § 152.025, subd. 2(a)(1) (2012). Haefs moved to suppress evidence seized by the police officers during their entry of his home. The district court held an omnibus hearing on the issue and denied Haefs's motion to suppress, finding that D.S. had authority to consent to the search based upon her mutual use of the property and that her authority to

4

consent was apparent to the officers when they observed, consistent with her claims, that her belongings were on the sidewalk in front of the house.

In April 2013, the district court convicted Haefs in a stipulated-facts trial under Minnesota Rule of Criminal Procedure 26.01, subdivision 4, of fifth-degree drug possession. At sentencing, the district court imposed a stay of adjudication; a fine of $500.00; a sentence of 365 days, with 345 days stayed and nine days' credit for time served; and five years of probation. This appeal followed.

## D E C I S I O N

Haefs contends that the warrantless search of his home was unlawful because D.S. did not have the authority to consent to the search and that the district court erred in denying his motion to suppress evidence obtained in the search. We hold that the district court properly denied Haefs's motion to suppress because D.S. had the authority to consent to a search of the home based on her mutual use of the home at the time of the search.

"When reviewing pretrial orders on motions to suppress evidence, we independently review the facts to determine whether, as a matter of law, the [district] court erred in its ruling." *State v. Jackson*, 742 N.W.2d 163, 168 (Minn. 2007). When considering whether the police obtained a valid consent to search, the existence of actual or apparent authority to consent is a legal issue, which we review de novo. *See State v. Thompson*, 578 N.W.2d 734, 740–41 (Minn. 1998) (holding, without deference to the district court, that police obtained consent to search from someone with apparent authority).

Both the United States and Minnesota Constitutions prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. "The Minnesota Constitution protects citizens against *unreasonable* government intrusions upon areas where there is a legitimate expectation of privacy." *State v. Davis*, 732 N.W.2d 173, 178 (Minn. 2007). The appellant has the burden of showing that the police intruded on an area in which he had a legitimate expectation of privacy. *Id.* To determine whether the constitutional prohibition against unreasonable searches and seizures has been violated, this court examines the specific police conduct at issue. *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008).

"It is well-settled law that individuals have a reasonable expectation of privacy in their own homes and thus have the capacity to challenge warrantless entries and searches of their homes." *In re Welfare of B.R.K.*, 658 N.W.2d 565, 572 (Minn. 2003). A warrantless search of a private residence is per se unreasonable. *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967); *B.R.K.*, 658 N.W.2d 565 at 578. Generally, a warrant is required to conduct a search unless the state can show that an exception to the warrant requirement exists. *State v. Ture*, 632 N.W.2d 621, 627 (Minn. 2001). A valid consent to search is a well-established exception to the warrant requirement under the United States and Minnesota Constitutions. *Thompson*, 578 N.W.2d at 740.

A third party has actual authority to consent to a search if that person has "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974); *see State v. Licari*, 659 N.W.2d 243, 250–51 (Minn. 2003) (applying *Matlock* in

6

Minnesota). The Supreme Court noted that the common authority that allows third party consent "does not rest upon the law of property, with its attendant historical and legal refinements." *Matlock*, 415 U.S. at 171 n.7, 94 S. Ct. at 993 n.7 (internal citations omitted).

Rather, common authority requires

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* To determine whether a person had lawful authority to consent to a search of a home, we consider the totality of the circumstances surrounding the person's consent. *Cf. Thompson*, 578 N.W.2d at 740 (holding, under a "totality of the circumstances" test, that police obtained consent from a person with apparent authority).

Where there is no actual authority to consent, a search will still be upheld if the person granting consent has apparent authority. *Id.* Apparent authority is judged under an objective standard: does an officer reasonably believe the third party has authority over the premises and can give consent. *Id.* Although it may prove erroneous, an officer's belief that a third party has authority will be upheld so long as it is reasonable. *Illinois v. Rodriguez*, 497 U.S. 177, 185–86, 110 S. Ct. 2793, 2800 (1990). When the police rely on facts that, if true, would not establish actual authority, then reliance on those facts is unreasonable and the apparent authority doctrine will not apply. *Licari*, 659 N.W.2d at 253.

7

Both parties assert, and we agree, that we review this pretrial issue based on the evidence in the record from the omnibus hearing. *See State ex rel. Rasmussen v. Tahash*, 272 Minn. 539, 553–56, 141 N.W.2d 3, 13–14 (1965) (noting that when a "defendant elects to contest the admissibility of the evidence upon Federal constitutional grounds, a pretrial fact hearing on the admissibility of the evidence will be held" and that the court will rule on the admissibility of the evidence only "[u]pon the record of the evidence elicited at the time of such hearing"). The omnibus hearing consisted solely of testimony from Officer Kolling and Sergeant Dillon; no exhibits—including the police reports—were offered or admitted.

The record here shows that D.S. had actual authority to allow the police officers to search the home because she had mutual use of the residence. D.S. had lived in the house with Haefs for more than a year and was raising Haefs's child with him in the home. She received mail at the home and, as a parent of an infant, she had access to the basement where the home's washer and dryer were located. On the very day of the search, she was living at the home and called the police there twice—once because of a domestic dispute and once to get a police escort to be safe while she gathered her and their child's belongings to move out of the house. Although she did not have a key to enter the house, she explained that she had never needed a key to gain entry to the house before. She said that she did not think a lease existed for the house; apart from this statement, the district court record does not address who legally owned or leased the house.

The totality of the circumstances here—D.S.'s presence at the home that morning and evening; her assertion that she wanted an escort so that she could safely move out;

8

the length of time that D.S. and her child had lived in the home; the presence of the child's and D.S.'s belongings in the home; D.S.'s receipt of mail at the home; D.S.'s statement that she did not have a key because the doors were never locked; the police officer's knowledge of the domestic dispute that morning; D.S.'s statement that she was *moving* out; the uncertainty regarding whether Haefs was present; and D.S.'s express invitation to the police to accompany her inside the house—demonstrates that D.S. had a "sufficient relationship to the premises" and actual authority to validly consent to the search and that the police response was not unreasonable. *See Matlock*, 415 U.S. at 171, 94 S. Ct. at 993; *see also State v. Hanley*, 363 N.W.2d 735, 739 (Minn. 1985) (finding that a girlfriend had common authority over an apartment to consent to a search when she was present at the time of the search, had her name on the mailbox, possessed a key, stored her clothing and jewelry there, had lived there on and off for over a year, and had paid rent); *United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir. 1988) (finding that estranged wife who had moved out of the defendant's apartment two weeks earlier, was able to obtain a key from her sister, and who retrieved personal belongings from the apartment during the search had mutual use of the apartment and adequate authority to consent to a search).

Because we determine that D.S. had actual authority to consent to the search, we need not reach the question of apparent authority. But we note that even if D.S. did not have actual authority to consent, the search would be valid under the apparent authority doctrine. A search will be upheld under apparent authority if the officers reasonably believed that a party had actual authority to consent to the search. *Thompson*, 578

N.W.2d at 740. We think that it would have been reasonable for the officers to believe that, based on the facts available to them here, D.S. had authority to consent.

The dissent believes that our decision is incorrect because of additional undisputed facts that were known to the police. These facts include that Haefs's relationship with D.S. ended after their argument earlier that day, that D.S. wanted to retrieve a television and nonvital personal property, and that Haefs implicitly asserted sole authority over the house.[1] But these facts are not in the record before us, and we cannot consider them here. *See Rasmussen*, 141 N.W.2d at 13–14. Accordingly, we decline to share the dissent's assumption that D.S. had indisputably been excluded from the home by Haefs, the lawful possessor. Nothing in the record establishes his right to instantly bar everyone from the house, including locking out D.S.

Moreover, these facts may have affected the analysis *only* if the record also established that the officers were aware of them at the time, and that their belief that D.S. could consent was unreasonable. In *Rodriguez*, for example, the police knew the alleged co-occupant had a key and clothes and furniture in the apartment, although it was unclear if they knew whether she continued to live there. 497 U.S. at 179, 110 S. Ct. at 2797. The case was remanded for reconsideration of apparent authority even though the record on appeal showed that the woman had moved out of the apartment a month earlier, never

---

[1] The dissent also notes that D.S. did not assert a tenancy right to the home. We find this fact unpersuasive. In *Rodriguez*, the Court noted that there may be situations in which a party expressly states that they live on the premises but will still lack authority to consent to a search. 497 U.S. at 188–89, 110 S. Ct. at 2801. In *Thompson*, the third party explicitly stated that he did *not* live in the apartment and asserted no rights to the property. 578 N.W.2d at 737. The court held nevertheless that it was reasonable for the officers to believe that he had authority to consent to their entrance. *Id.* at 740.

went there when the defendant was not home, was not on the lease, did not pay rent, and had taken the key without his knowledge. *Id.* at 181, 110 S. Ct. at 2797–98.

The dissent also ascribes certain motivations to the police and notes that they could have applied for a search warrant. While the latter is true, it is well-established that "[a] warrantless consent search is reasonable and thus consistent with the Fourth Amendment irrespective of the availability of a warrant." *Fernandez v. California*, 134 S. Ct. 1126, 1137 (2014). We also decline to speculate about the officers' subjective motivations because "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." *Whren v. United States*, 517 U.S. 806, 814, 116 S. Ct. 1769, 1775 (1996); *see also Fernandez,* 134 S. Ct. at 1134 (stating that an officer's motive does not invalidate objectively reasonable behavior under the Fourth Amendment).

Here we cannot say that the police acted unreasonably when they assisted D.S. in moving out of the house. The officers knew Haefs and knew his history of verbal aggression towards police. They knew Haefs and D.S. had a domestic dispute that morning, which may have been physically violent. The officers contacted Haefs about the situation. Although he stated that D.S. was not permitted in the house, nothing in the record shows that he informed the police of his sole possessory interest in the house or his authority to effectively bar others from entering. Although Haefs told them that he was not at home, they were unable to verify that assertion. The officers' behavior here was not unreasonable, especially in light of their concern for the safety of D.S. and themselves.

Finally, our decision today is consistent with more recent United States Supreme Court decisions since *Matlock* and *Rodriguez*. In *Georgia v. Randolph*, the Supreme Court considered whether a warrantless search was valid when one occupant gave permission and another—present at the scene—expressly refused to consent. 547 U.S. 103, 106, 126 S. Ct. 1515, 1518–19 (2006). As the Court noted, neither *Matlock* nor *Rodriguez* were affected by its holding: "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search . . . ." *Id.* at 121, 126 S. Ct. at 1527. Because Haefs was not physically present in this case, *Randolph* does not apply.

In *Fernandez*, the Supreme Court refused to extend the holding of *Randolph* to a co-occupant who was present and refused a search but was then removed by police. 134 S. Ct. at 1130. The Supreme Court, stressing the narrow holding of *Randolph*, *id.* at 1133, upheld a search in which a physically present person specifically objected to a search of his apartment, was arrested and removed, and consent was later granted by the co-occupant, *id.* at 1137. The case again turned on physical presence, and shows that Haefs's assertion on the cell phone that D.S. was not allowed in the house would not invalidate the consent of D.S., who was physically present and had common authority to consent.

In sum, based upon the totality of circumstances presented here, D.S. had a sufficient relationship to the shared dwelling so that she could invite the police to escort her inside the house, and they could reasonably assist her when she was moving out. *See Matlock*, 415 U.S. at 171 n.7, 94 S. Ct. at 993 n.7; *see also Randolph*, 547 U.S. at 110,

12

126 S. Ct. at 1521 ("The common authority that counts under the Fourth Amendment may thus be broader than the rights accorded by property law . . . ."). Because we conclude that the warrantless entry into the home was not unreasonable, we affirm the district court's denial of Haefs's motion to suppress evidence.

**Affirmed.**

**ROSS**, Judge (dissenting)

I readily acknowledge the appalling incivility in Haefs's decision to toss his former girlfriend's clothes outside and lock the door of his home after their apparently relationship-ending argument. But the Constitution does not prohibit unkind behavior, and there is no help-the-angry-ex-girlfriend-break-in-to-get-her-stuff exception to the Fourth Amendment's rule that police need a warrant before they can enter and search someone's house. I therefore respectfully dissent.

Police learned from Haefs's former cohabitating girlfriend, D.S., that Haefs was growing marijuana in the basement of his home. Specifically, the officer on the scene called his supervisor and informed him that while he was standing by outside the residence, D.S. "disclosed that there was an operational marijuana grow in the basement." The supervisor went immediately to the house. But police had no warrant to enter to search for the marijuana. And they knew that Haefs had not consented to a warrantless entry.

Rather than respect Haefs's apparent property right to bar all others from his home, including his former girlfriend, and his constitutional right to bar police, the officers said and did nothing to discourage or prevent D.S. from breaking in. And after they watched her break a window and then batter down the door, they followed her inside and seized the marijuana that D.S. told them they would find. In my view, neither the United States Constitution nor the Minnesota Constitution excepts a circumstance like this from the express search warrant requirement.

D-1

The majority reaches a different conclusion. It concludes that even though Haefs indicated his control of the property and expressly informed police that he prohibited D.S. from entering, D.S. had authority to consent to the search based upon her mutual use of the property, and it agrees with the district court that this supposed authority was apparent to the officers when they observed that her belongings were on the sidewalk in front of the house.

But the officers never testified that it was apparent to them from D.S.'s belongings left on the curb that she had any continuing authority to enter or to consent to police entry, so I cannot agree with the district court's and the majority's supposition. And I dissent particularly because even if we could stretch the testimony to surmise that officers actually developed such a belief, the undisputed facts would render the belief wholly unreasonable. Indeed, the only reasonable inference from the undisputed facts is not that D.S. had current mutual use of the home, but rather that her previous permission for mutual use had been unmistakably revoked when Haefs locked her out, discarded her belongings, and expressly prohibited her from entering. It's hard to imagine a clearer message.

To be sure, I do not think the majority is far off; if the facts were more limited, I would agree with its conclusion. Specifically, if officers knew *only* those relevant facts highlighted by the majority—that D.S. had moved into and had access to the home throughout the previous year including earlier that same day and that she was moving out—the officers might infer that D.S. had continued mutual authority and use of the home, along with the right to consent to police access. But the reasonableness of the

inference evaporated here once the officers learned the additional undisputed facts. They learned that D.S. was not on any lease; that D.S. did not even know whether a lease existed (a fact that any contracting tenant would certainly possess); that there was an apparently relationship-ending argument between Haefs and D.S. earlier that day; that Haefs had never given D.S. a key when she moved in or even during the entire time she lived there; that Haefs, but not D.S., had the means to lock others out; that Haefs in fact did lock D.S. out; that D.S.'s only means to enter was to break in through a window or door; that D.S. never expressly asserted that she had any tenancy right to enter the home; that D.S. never claimed that any of the personal property she sought was vital or urgent; and that Haefs had not only implicitly asserted sole authority over the home, he also expressly informed police by telephone that D.S. was, at that moment, not permitted to enter. Knowing this more complete story, no one can reasonably infer or conclude that D.S. continued to enjoy mutual use of the house.

I base my dissent on those facts, but other details suggest an overreach by the state and police, and they warrant mentioning. For example, the district court record establishes that police knew (and even included in their reports) that D.S. had identified some of the clearly nonvital property she was trying to retrieve, like her "television," but the state and the officers did not share that detail during the omnibus hearing. Also, although police understood that being named on the lease was important to a person's authority to consent to police entry (and to another person's right to withhold consent), after they learned from D.S. that she was *not* on any lease, they apparently chose not to ask Haefs to identify who *was* on the lease. And it is most troubling that the officers (and

the majority) repeatedly refer to the supposed police entry motive as being "to protect" D.S. from Haefs. The *only* stated basis for this supposed motive is the officers' factually meaningless characterization that they were "not certain" that Haefs was absent from the home when D.S. broke in. But the police had no evidence-based reason to suspect that Haefs was home; Haefs told police on the phone that he was not in the house, and D.S. told the officers that "she believed that [Haefs] *wasn't* home." Of course the officers were metaphysically uncertain that Haefs was absent, but they were not reasonably uncertain because no fact or circumstance presented during the hearing contradicted D.S.'s and Haefs's statements that Haefs was absent.

The majority cites no authority for its implied legal proposition that having one's personal property in someone else's home affords the clearly excluded person the right to break in to retrieve that property so as to continue the "mutual use" that she *previously* enjoyed. I am aware of no such authority and would be surprised to learn of its existence. The majority's focus on the fact that D.S. *had* lived in the house for a year and *had been living there* as recently as that morning does not change the relevant fact that police had every reason to know that, at the time they contemplated their drug-interdiction entry that evening, she did not *continue to live there* or have the unilateral right to enter. In my view this forecloses the majority's conclusion that D.S. had the extant right to invite police inside and lead them to Haefs's marijuana grow.

The majority questions Haefs's right to bar everyone from his home. It reasons that "[n]othing in the record establishes [Haefs's] right to instantly bar everyone from the house, including locking out D.S." If the majority is making a factual observation, it lacks

D-4

record support. The record establishes expressly that D.S. told police that she moved *into Haefs's home* after becoming pregnant and had been "living *with him*" since then. Not even the state (which has the burden of proof here) has suggested that Haefs was not the lawful possessor as a matter of fact. If the majority is making a legal observation, it is also wrong. Any person lawfully possessing a house has the "right to instantly bar everyone from" it as a matter of law. The Supreme Court has explained that "the right to exclude" is "universally held to be a fundamental element of the property right." *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80, 100 S. Ct. 383, 393 (1979); *see also Edina Community Lutheran Church v. State*, 745 N.W.2d 194, 207 (Minn. App. 2008), *review denied* (Minn. Apr. 29, 2008) ("[O]ne of the fundamental elements of property rights is the right to exclude others."); *Black's Law Dictionary* 1203 (8th ed. 2004) (defining possessory interest as "[t]he present right to control property, including the right to exclude others, by a person who is not necessarily the owner"). The majority's implication that a possessor can bar another only gradually, not "instantly," also lacks any cited support.

Rather than analyze the police entry based on D.S.'s post-exclusion circumstances, the majority justifies the officers' entry based on her pre-exclusion shared use. The majority relies on cases that support only the noncontroversial proposition that a *current* third-party occupant might possess actual authority to consent to a search because of that third-party occupant's *current* mutual use of the property. *See United States v. Matlock*, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 993 (1974) (recognizing that currently cohabitating girlfriend enjoys "mutual use" of premises and could give valid consent to search

bedroom she shared with defendant); *cf. State v. Licari*, 659 N.W.2d 243, 249–50, 252 (Minn. 2003) (accepting that current co-occupant may give valid consent but concluding that landlord does not enjoy mutual use necessary to give valid consent). *Matlock* and *Licari* are scarcely relevant here, where the third party had been, indisputably, already excluded from the home by its apparent lawful possessor. Those cases recognize that, to the extent a lawful possessor permits another party to occupy his home, that party can then validly invite police to enter and search the *currently* shared areas. The cases do not go any further to say that the third party continues to carry that consent authority even one minute after her occupancy permission was revoked by the lawful possessor.

The majority lists multiple circumstances and concludes that they establish D.S. had actual authority to consent to police entry. I differ. The majority's list includes "D.S.'s presence at the home that morning and evening," but under the circumstances, D.S.'s presence at the home that evening was as a former occupant, locked out and expressly declared unwelcome; it includes "her assertion that she wanted an escort so that she could safely move out," but these are mere claims, not relevant circumstances, and they could be made by any excluded formerly cohabitating boyfriend or girlfriend with no accompanying current right of entry; it includes "the length of time that D.S. and her child had lived in the home," but no case cited by the majority holds that "the length" of a former occupancy establishes current "mutual use" after  the former occupant was physically and verbally excluded; it notes "the presence of the child's and D.S.'s belongings in the home," but no cited case holds that having one's belongings in a home from which one has been expressly excluded confers authority to reenter; it points to

D-6

"D.S.'s receipt of mail at the home," which says nothing of her continued authority to reenter after exclusion; it notes "D.S.'s statement that . . . the doors were never locked," but this is not evidence of current mutual use and it also ignores the officer's competing testimony that acknowledged that D.S. told him the home "was *usually* unlocked;" it adds "the police officer's knowledge of the domestic dispute that morning," but this confirms only that D.S. enjoyed mutual use "that morning," not that evening after she had been excluded; it includes "the uncertainty regarding whether Haefs was present"—the supposed uncertainty that I have described as specious under the undisputed facts; and finally, it emphasizes "D.S.'s express invitation to the police to accompany her inside the house," but this is evidence only that D.S. expressly invited police to enter, not that she had any authority to do so.

The various additional cases relied on by the majority are unconvincing: they are all inapposite. *State v. Hanley* has no bearing on the issue we are addressing. The supreme court's holding in *Hanley* that a girlfriend validly consented to a search of an apartment she shared with the defendant expressly emphasized that the girlfriend "had the key to an apartment in which the [defendant] resided" and that she also "paid the rent" on the apartment. 363 N.W.2d 735, 736 (Minn. 1985). And the opinion does not suggest that Hanley ever excluded the search-consenting girlfriend from the apartment. *United States v. Trzaska* involved a current wife's consent to the search of an apartment she shared with her estranged husband and for which she continued to possess a key. 859 F.2d 1118, 1120 (2d Cir. 1988). The *Trzaska* court specifically relied on two similar federal cases in which the consenter and the accused also were married and continued to have joint ownership or

joint possessory rights to the respective properties *as married couples*. *See id.*, citing *United States v. Crouthers*, 669 F.2d 635, 642–43 (10th Cir. 1982) (observing that consenting wife had not abandoned marriage or apartment and retained an apartment key); *United States v. Long*, 524 F.2d 660, 661 (9th Cir. 1975) (observing that wife was joint owner of the house that was the subject of her consent to search). Haefs and D.S. are not married, and Minnesota does not confer joint-property rights on couples simply because they lived together or share a child.

Georgia v. Randolph and Fernandez v. California, two Supreme Court cases that also involve the validity of consent given by an occupant of jointly occupied premises, are even less relevant. In *Randolph*, the Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." 547 U.S. 103, 120, 126 S. Ct. 1515, 1526 (2006). *Randolph* obviously undercuts, rather than supports, the majority's holding for two reasons. First, in this case the police were informed expressly that Haefs, whom the police knew to be a current resident, did not consent to their entry. Second, the issue here hangs on whether D.S. was a current joint resident when she gave her consent to search, while *Randolph* addresses the question of consent when two current residents undisputedly have current mutual authority to consent and one of them expressly withholds consent. The majority is correct that *Fernandez v. California* refused to extend *Randolph* to apply to a current co-occupant who refused a search but was then removed by police. 134 S. Ct. 1126, 1130

D-8

(2014). But this just makes *Fernandez* less applicable and even less supportive of the majority opinion here than *Randolph*.

The majority's reasoning that D.S. had authority to invite officers inside overlooks the Supreme Court's explanation in *Illinois v. Rodriguez* that, "[e]ven when [a third party's] invitation [into someone else's home] is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." 497 U.S. 177, 188, 110 S. Ct. 2793, 2801 (1990). Because the "surrounding circumstances" of D.S.'s supposed right to enter would cause any "reasonable person [to] doubt its truth and not act upon it without further inquiry," the police clearly exceeded their constitutional authority by acting without further inquiry. For instance, they could have inquired further to validate their factually unsupported concern that Haefs might have been present inside. Or they could have inquired further into whether D.S. shared Haefs's tenant rights after they learned that D.S. was not on any lease. Or they could have directed D.S. to meet them after Haefs returned home so they could negotiate D.S.'s safe entry to obtain her belongings. Or they could have sent D.S. away and directed her to secure a judicial order requiring Haefs to allow her to retrieve her belongings from the home or requiring him to deliver them to her. Or of course they also could have sought a warrant based on D.S.'s report of Haefs's marijuana grow.

The officers had many constitutional options. In my opinion, they took an unconstitutional route when they responded eagerly to D.S.'s tip that Haefs was growing marijuana, tacitly condoned D.S.'s break-in, and then entered and searched Haefs's house without a warrant.