ANDERSON, Justice.
A cabin in northern Minnesota was burglarized and then destroyed in a fire. Trail camera pictures showed the truck of appellant Colton Tyler Boettcher at the scene, and the property owner's generator was later found in his truck. Boettcher was charged with second-degree burglary and first-degree arson. A jury found Boettcher guilty of burglary but did not reach a verdict on the arson charge. The State declined to retry Boettcher for arson. After determining that the arson was factually related to the burglary, the district court ordered Boettcher to pay restitution for the destruction of the cabin. The court of appeals affirmed. Because we conclude that the court of appeals erred by applying a factual-relationship standard, we reverse and remand to the court of appeals for reconsideration under the direct-causation standard.
FACTS
In 2010, when Z.D. returned from military service in Iraq, he built a cabin near Culver. The cabin was built on weekends, over a number of years, by Z.D. and his father. Z.D. and his family vacationed there frequently. In November 2014, Z.D. closed the cabin for the winter. When Z.D. returned the following spring, the cabin was an "ash pile." Z.D. shared with law *378 enforcement his pictures from two motion-detection trail cameras that he had set up on the property. These cameras provided a series of photographs that showed individuals entering onto his land, carrying away property, and leaving the cabin in flames.
Following a law enforcement investigation, the State charged Boettcher with several offenses involving Z.D.'s cabin, including first-degree arson, Minn. Stat. § 609.561, subd. 1 (2018), and second-degree burglary, Minn. Stat. § 609.582, subd. 2(a)(1) (2018). Boettcher pleaded not guilty and demanded a jury trial.
In describing their investigation, law enforcement officers testified as follows. The trail camera pictures implicated Boettcher and his friends Tyler Klennert and Brody Dunham in several ways. Pictures from the first trail camera captured images of three distinct individuals, and the timestamp on the pictures was December 13, 2014, the same date of four known cabin burglaries committed by Boettcher, Klennert, and Dunham. Moreover, pictures from the second trail camera captured images of a distinctive headlight pattern that closely resembled the headlights of Boettcher's truck.
When law enforcement officers spoke with Klennert about the destruction of Z.D.'s cabin, he provided the officers misleading information about Boettcher's involvement, claiming that he did not remember a burglary with an arson.[1] After the officers told Klennert that they had found an item from Z.D.'s property in the back of Boettcher's truck, Klennert admitted that Boettcher had started the fire.[2] More specifically, Klennert said that all three of them were inside the cabin. As he was "grabbing stuff," Klennert noticed that it was starting to get smoky, and he saw Boettcher lighting things in the room on fire. He said that "things were already burning and so ... he grabbed a few things and got out of there" and that "Brody got out of there too and ultimately so did Colton." Like Klennert, Dunham provided officers misleading information about Boettcher's involvement in the destruction of Z.D.'s cabin.[3]
Klennert testified to the following facts at trial. Dunham cut the lock on a gate to get onto the Z.D. property. All three then got out of the truck, and all three went into the cabin. A television, generator, DVDs, and ammunition were taken from the cabin before it was destroyed. When asked about specifics, Klennert testified, "I really don't remember much of any of it honestly ...." After refreshing his recollection with the transcript of his plea hearing, Klennert then testified that Boettcher started the fire. On cross-examination, although Klennert testified that "something like a lighter or matches" were used to light the fire, he also testified, "I don't know how to explain it exactly." Klennert testified that the three left quickly after the fire was started. On redirect, Klennert elaborated further: "[T]he more we talk about this, the more it has been coming back to me .... I do remember him [Boettcher] starting the fire, yes." He testified that he was with Boettcher in the cabin when he saw him start the fire. When asked to describe what he saw, *379 Klennert testified: "Just lighting random sh*t, just anything that would light on fire."
Dunham also testified against Boettcher. Dunham did not remember much about the burglary or arson of the cabin owned by Z.D. Dunham testified that he never went inside but stayed in the truck in the back passenger side. He got out before the cabin was set on fire only to "help carry stuff." He did not remember the distance from the cabin to where the truck was parked, but he added that the truck "[w]asn't that far" and that he had a good view. According to Dunham, Boettcher started the fire. When asked why he remembered this, Dunham testified, "Cause I seen him do it." Dunham was in the truck at that time. While in the truck, he saw "oil getting poured and then, again, lit on fire."
The district court instructed the jury, as relevant here, that an element of first-degree arson is that the defendant caused the fire. The jury was also specifically instructed that an element of burglary is that the defendant entered the building "with intent to commit the crime of theft." After deliberating nearly 6½ hours, the jury found Boettcher guilty of burglary, but could not reach a verdict on the arson charge. The district court accepted the partial verdict, and the State elected not to retry Boettcher on the arson charge.
At the sentencing hearing, the district court sentenced Boettcher to 57 months in prison, stayed execution of the sentence, and placed Boettcher on supervised probation for 4 years. The court reserved the issue of restitution for a later date.
Z.D. and his wife, along with their insurance company, filed an affidavit for restitution with the district court, requesting compensation for their losses, including fire damages and clean-up expenses. Z.D. requested $26,181.79, and the insurance company, $55,750.00.
The district court ordered Boettcher to pay the entire amount requested, $81,931.79. After Boettcher challenged the restitution order, arguing that the fire damage was not a predictable or natural consequence of the burglary, the district court held a hearing and affirmed its prior determination. Quoting State v. Nelson , 796 N.W.2d 343, 347 (Minn. App. 2011), the district court concluded that the applicable legal standard for determining whether the loss resulted from the defendant's actions required a "factual relationship to the crime committed," specifically a compensable loss "directly caused by the conduct for which the defendant was convicted." But instead of considering whether the fire damage was "directly caused" by the conduct for which Boettcher was convicted, the district court considered whether the arson was "related to" the burglary. The district court rejected Boettcher's argument that the arson was not a predictable or natural consequence of the burglary, concluding that "it is not unusual that a burglary results in some property damage, or destruction of potentially incriminating evidence." The district court relied on several facts, including that Dunham and Klennert testified that Boettcher started the fire and that a trail camera picture "appeared to show" that Boettcher was the last person out of the cabin. The district court reasoned that, although Boettcher was "not required to pay restitution for acts unrelated to the burglary," "the arson [was] clearly related to the burglary."
The court of appeals affirmed. State v. Boettcher , No. A17-1426, 2018 WL 2186993, at *4 (Minn. App. May 14, 2018). Like the district court, the court of appeals used the phrase "directly caused" in describing the applicable legal standard. Id. (explaining that the issue was "whether *380 the destruction of the cabin ... was directly caused by the burglary"). But instead of considering whether the fire damage was "directly caused" by the conduct for which Boettcher was convicted, the court of appeals considered whether "there was a factual relationship in time, victims, and location between the conduct for which restitution is being ordered and the crime of which Boettcher was convicted." Id. (emphasis added). After reviewing the record, the court of appeals concluded that the burglary and the fire were sufficiently "factually intertwined" to allow restitution. Id.
We granted Boettcher's petition for review.
ANALYSIS
Boettcher contends that the court of appeals misapplied the law by using a factual-relationship standard to consider whether the fire damage was a result of his crime. We agree.
The "district court has broad discretion to award restitution, and the district court's order will not be reversed absent an abuse of that discretion." State v. Andersen , 871 N.W.2d 910, 913 (Minn. 2015). "A court abuses its discretion when its decision is based on an erroneous view of the law ...." Riley v. State , 792 N.W.2d 831, 833 (Minn. 2011).
As part of a felony sentence, a district court may require an offender to pay "court-ordered restitution in addition to either imprisonment or payment of a fine, or both." Minn. Stat. § 609.10 subd. 1(a)(5) (2018) ; see also Minn. Stat. § 609.125, subd. 1(a)(4) (2018) (authorizing restitution upon conviction of a misdemeanor or gross misdemeanor). To determine "whether to order restitution" and "the amount of restitution," a district court must consider the defendant's ability to pay and the loss sustained by the victim of the crime. Minn. Stat. § 611A.045, subd. 1(a) (2018).
Several statutes establish that a district court may order a defendant to pay restitution for losses that result from the crime. See Minn. Stat. §§ 611A.01(b) (defining "victim" as a person "who incurs loss or harm as a result of a crime"), .04, subd. 1(a) (stating that victims may request restitution for "any out-of-pocket losses resulting from the crime"), .045, subds. 1(a)(1) (requiring the court "in determining whether to order restitution and the amount of the restitution" to consider "the amount of economic loss sustained by the victim as a result of the offense"), 3(a) (putting the evidentiary "burden of demonstrating the amount of loss sustained by a victim as a result of the offense" on the prosecution) (2018).
In the context of criminal restitution, we have interpreted the word "result" in two prior cases. In State v. Palubicki , the defendant was convicted of first-degree murder. 727 N.W.2d 662, 664 (Minn. 2007). He challenged the district court's order granting the restitution request of the family of the victim for the family's costs of attending his murder trial. Id. at 663. To reach our decision, we interpreted Minn. Stat. § 611A.04, subd. 1(a), which provides that a restitution request "may include, but is not limited to, any out-of-pocket losses resulting from the crime, including ... replacement of wages and services." See Palubicki , 727 N.W.2d at 666. We concluded that the family's costs of attending the trial were not "too attenuated from the criminal act" and that "[t]he next of kin were in court as a direct result of Palubicki's crime." Id. at 667 (emphasis added). We rejected the State's argument that a "but-for" test should apply[4] because it *381 would create a potential "for a restitution claim to become so attenuated in its cause that it cannot be said to result from the defendant's criminal act." Id.
Eight years later, we reaffirmed the direct-result standard in State v. Riggs , 865 N.W.2d 679 (2015). There, we defined the word "result" as used in Minn. Stat. § 611A.045, subd. 1(a)(1), as "follows naturally from" and "to happen as a consequence." Riggs , 865 N.W.2d at 685-86 (quoting The American Heritage Dictionary of the English Language 1497 (5th ed. 2011)). Based on this definition, we said that subdivision 1(a) "plainly requires the district court to consider the economic loss sustained by the victim as a consequence of the defendant's violation of the law." Id. at 686.
The general rule articulated in Palubicki and Riggs is that a district court may order restitution only for losses that are directly caused by, or follow naturally as a consequence of, the defendant's crime.[5] But neither the district court nor the court of appeals applied this standard. Both courts were led astray by the confusing articulation of the direct-causation standard in State v. Nelson , which states that "a loss claimed as an item of restitution by a crime victim must have some factual relationship to the crime committed-a compensable loss must be 'directly caused by the conduct for which the defendant was convicted.' " 796 N.W.2d 343, 347 (Minn. App. 2011) (citation omitted). This articulation equates "some factual relationship" with "direct[ ] caus[ation]." See id. But the Legislature did not provide that victims recover losses that merely have "some factual relationship to" the crime of conviction. Instead, the Legislature repeatedly used the word "result," and "result" means causation. See Paroline v. United States , 572 U.S. 434, 445, 134 S.Ct. 1710, 188 L.Ed.2d 714 (2014) (stating that "the words 'as a result of' plainly suggest causation" within a federal restitution provision). Specifically, that causation must be direct. Palubicki , 727 N.W.2d at 667 (inquiring whether the victims' losses were the "direct result" of the offense); see also Riggs , 865 N.W.2d at 685 (defining "result" as "follows naturally from"). To the extent that the articulation by the court of appeals of the direct-causation standard in Nelson allows criminal restitution for losses that merely have a "factual relationship" to the defendant's crime, Nelson is in direct conflict with existing law, including our decisions in Palubicki and Riggs , and it is overruled.
Here, the court of appeals did not apply the direct-causation standard articulated in Palubicki and Riggs . Instead, it affirmed the district court's restitution order because "there was a factual relationship in time, victims, and location between the conduct for which restitution is being ordered and the crime of which Boettcher was convicted." Boettcher , No. A17-1426, 2018 WL 2186993, at *4 (emphasis added).
When the court of appeals has applied an incorrect legal standard in the past, we have remanded to the court of appeals for application of the correct legal standard. See Johnson v. City of Minneapolis , 667 N.W.2d 109, 115 (Minn. 2003) (explaining that when the court of appeals has applied *382 an improper standard, "we generally would either proceed to apply the correct standard or remand to the court of appeals for application of the proper standard"); see also State v. Kates , 610 N.W.2d 629, 631 (Minn. 2000) ; State v. Dillon , 532 N.W.2d 558, 559 (Minn. 1995) (order). Consistent with our past practice, we reverse the decision of the court of appeals and remand to that court for reconsideration of Boettcher's appeal under the direct-causation standard.[6]
CONCLUSION
For the foregoing reasons, we reverse the decision of the court of appeals and remand to the court of appeals for application of the direct-causation standard.
Reversed and remanded.

Klennert subsequently pleaded guilty to aiding an offender (obstructing investigation), Minn. Stat. § 609.495, subd. 3 (2018).

The item found in the back of Boettcher's truck was a red Homelite-brand generator. Before the fire, Z.D. had taken a picture of a red Homelite-brand generator that he owned. A deputy testified that the picture from Z.D. matched the generator found in Boettcher's truck "almost to a tee."

Dunham subsequently pleaded guilty to aiding an offender (obstructing investigation), Minn. Stat. § 609.495, subd. 3.

The "but-for" test of causation asks whether a result " 'would not have happened but for defendant's ... act.' " Kryzer v. Champlin Am. Legion No. 600 , 494 N.W.2d 35, 37 (Minn. 1992) (quoting Childs v. Standard Oil Co. , 149 Minn. 166, 182 N.W 1000, 1001 (1921) ).

In this case, the restitution order followed a jury trial, not a guilty plea. Principles that apply to criminal restitution in guilty-plea cases, see, e.g. , State v. Kennedy , 327 N.W.2d 3, 4 (Minn. 1982) (allowing the defendant to agree to pay restitution for the losses of victims not named in complaint in exchange for dismissal of charges), are inapplicable.

Of course, nothing in this opinion should be construed to limit in any way the right of the victims to pursue a civil action against one or more of the responsible parties for the intentional and wrongful conduct of those parties in the destruction of the victim's property. "A decision for or against restitution in any criminal or juvenile proceeding is not a bar to any civil action by the victim ... against the offender." Minn. Stat. § 611A.04, subd. 3 (2018).