*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1663**

State of Minnesota,
Respondent,

vs.

Reymundo Gonzalez,
Appellant.

**Filed August 26, 2024**
**Affirmed in part, reversed in part, and remanded**
**Johnson, Judge**

Olmsted County District Court
File No. 55-CR-21-1114

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mark A. Ostrem, Olmsted County Attorney, James E. Haase, Senior Assistant County Attorney, Rochester, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Eva F. Wailes, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Segal, Chief Judge; and Bratvold, Judge.

**NONPRECEDENTIAL OPINION**

**JOHNSON**, Judge

An Olmsted County jury found Reymundo Gonzalez guilty of second-degree criminal sexual conduct based on evidence that he touched a young girl's vaginal area over her clothing. We conclude that the district court did not err by admitting *Spreigl* evidence

of Gonzalez's conduct toward the girl's half-sister and that the prosecutor did not engage in misconduct that requires a new trial. But we conclude that the district court erred by ordering Gonzalez to pay restitution to the county sheriff's office for the costs of extraditing him from Texas to Minnesota. Therefore, we affirm in part, reverse in part, and remand for resentencing.

## FACTS

In September 2018, L.B., a 13-year-old girl living in Texas, confided to a relative that a man had sexually assaulted her when she was seven or eight years old while he was living in her family's home in Minnesota. L.B. did not know the man's name but said that he went by the nickname "Chief" and was known as the "grandpa" of her half-sister, though there was no such actual familial relationship. L.B. also said that the man has a mole on his face and tattoos. L.B.'s relative determined that the man was Gonzalez and confirmed that fact by showing L.B. a photograph of Gonzalez. L.B.'s relative made a report to Texas law-enforcement authorities, who arranged for a forensic interview of L.B. Texas law enforcement then referred the matter to Minnesota law enforcement. The City of Rochester police department conducted an investigation.

In February 2021, the state charged Gonzalez with first-degree criminal sexual conduct, in violation of Minn. Stat. § 609.342, subd. 1(a) (2012). The state alleged that Gonzalez committed the crime between November 2012 and November 2014. In June 2022, Gonzalez was extradited from Texas to Minnesota. In May 2023, the state amended the complaint by substituting a charge of second-degree criminal sexual conduct causing

fear of imminent great bodily harm, in violation of Minn. Stat. § 609.343, subd. 1(c) (2012).

The case was tried to a jury on two days in June 2023. The state called eight witnesses. L.B. testified that Gonzalez touched her vagina "countless times" and that he repeatedly hit her in the back of the head, grabbed her arm, or took off his belt and threatened to hit her with it. L.B. also testified that, on one occasion, Gonzalez grabbed her, pushed her into a wooded area behind her house, covered her mouth, tried to remove her clothes, and touched her vaginal area over her clothes. She testified that Gonzalez told her to stop screaming and said that he would kill her family if she tried to scream. L.B. testified further that, on one occasion, Gonzalez entered her bedroom while she was sleeping, touched her private parts, and placed a dollar bill under her pillow. L.B. gave the dollar bill to her mother and told her what had happened. L.B.'s mother confronted Gonzalez, who then ceased the inappropriate conduct for a while before resuming again. L.B. identified Gonzalez in the courtroom as the man who engaged in the conduct that she had described, based in part on the tattoos on his arms and the mole on his face.

Gonzalez did not testify. At the state's request, the district court submitted the charged offense to the jury and also submitted a lesser-included charge of second-degree criminal sexual conduct. The jury found Gonzalez guilty of both offenses. The district court imposed a sentence of 108 months of imprisonment on the charge alleged in the amended complaint. Gonzalez appeals.

## DECISION

### I. *Spreigl* Evidence

Gonzalez first argues that the district court erred by admitting the testimony of L.B.'s half-sister, B.G., who testified that Gonzalez once offered to give her a dollar if she would allow him to touch her private parts.

Gonzalez's argument is based on a rule of evidence that provides, "Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith," though it may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn. R. Evid. 404(b)(1). Evidence of other crimes or bad acts is known in Minnesota as "*Spreigl* evidence." *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn. 1998) (citing *State v. Spreigl*, 139 N.W.2d 167 (Minn. 1965)). Such evidence generally is inadmissible unless

> (a) the proffered evidence is relevant to an identified material issue other than conduct conforming with a character trait; (b) the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence; and (c) the probative value of the evidence is not outweighed by its potential for unfair prejudice to the defendant.

Minn. R. Evid. 404(b)(2). This court applies an abuse-of-discretion standard of review to a district court's admission of *Spreigl* evidence. *State v. Griffin*, 887 N.W.2d 257, 261 (Minn. 2016).

The *Spreigl* issue first arose seven months before trial, when the state gave notice of its intent to offer evidence of Gonzalez's conduct toward B.G. One week before trial,

the state filed a memorandum in which it asserted that the *Spreigl* evidence is admissible to prove a common scheme or plan and to prove identity. The state asserted that the incident involving B.G. is similar to the incident in which Gonzalez put a dollar bill under L.B.'s pillow after inappropriately touching her.

On the first day of trial, the district court heard arguments on the *Spreigl* issue and ruled provisionally that B.G.'s testimony would be admitted if she could identify Gonzalez as the man who had offered her a dollar. The district court reasoned that the *Spreigl* evidence would be relevant to intent and *modus operandi* and that the probative value of the evidence outweighed the potential for unfair prejudice, in part because Gonzalez did not actually touch B.G.

B.G. testified that, on one occasion while she and L.B. were living in the same house in Rochester, Gonzalez offered to give her a dollar if she would let him touch her private parts. B.G. testified that she refused and that Gonzalez did not touch her. B.G. also testified that she was "a hundred percent" sure that Gonzalez was that man based on "his mustache, his glasses, and his mole on the cheek."

Gonzalez argues that the district court erred in three ways. First, he contends that the district court erred by not examining "the real purposes" for which the *Spreigl* evidence was offered. *See State v. Ness*, 707 N.W.2d 676, 686 (Minn. 2006); *State v. Smith*, 749 N.W.2d 88, 94 (Minn. App. 2008). The state's asserted purposes were common scheme or plan and identity. The state relied on *State v. Wermerskirchen*, 497 N.W.2d 235 (Minn. 1993), which provides strong support for the introduction of *Spreigl* evidence in a prosecution for criminal sexual conduct against a child on the ground that such evidence

5

may be used to "establish common scheme or plan, *i.e.*, to establish that the act occurred." *Id.* at 241; *see also Ness*, 707 N.W.2d at 688; *State v. Asfeld*, 662 N.W.2d 534, 542 (Minn. 2003); *State v. Anderson*, 275 N.W.2d 554, 555-56 (Minn. 1978). The district court referred to the *Kennedy* opinion in ruling that the *Spreigl* evidence is admissible to show *modus operandi*. In *Kennedy*, the supreme court held that *Spreigl* evidence of a defendant's sexual conduct toward others may be relevant to show a common scheme or plan. 585 N.W.2d at 391. Other opinions have discussed the interrelationship between common scheme or plan and *modus operandi*. *See, e.g.*, *Ness*, 707 N.W.2d at 687-88. We construe the district court's ruling as approving of the state's theory of common scheme or plan. The district court did not abuse its discretion in ruling that there was a proper purpose for the state's *Spreigl* evidence.

Second, Gonzalez contends that the district court erred by not identifying the precise disputed fact to which the *Spreigl* evidence was relevant. This contention is resolved by the same caselaw that justified the state's purpose in introducing the evidence. The supreme court reasoned in *Wermerskirchen* that common-scheme-or-plan evidence is "highly relevant to the specific issue of whether the conduct on which the charge was based actually occurred or was, as the defendants contended, a fabrication or a mistake in perception by the victim." 497 N.W.2d at 242. Because the defendant in *Wermerskirchen* had denied the alleged sexual conduct, the *Spreigl* evidence was "highly relevant" in that "it showed an ongoing pattern of opportunistic fondling of young girls within the family context and, therefore, tended to disprove the defense that [the complainant] was fabricating or imagining the occurrence of sexual contact" and conveyed to the jury "a clear

indication of . . . a design or a pattern of behavior involving the opportunistic sexual exploitation of young girls within the family context." *Id.* (quotation omitted). In this case, Gonzalez's attorney argued in closing argument, that "multiple people could have abused this young girl" but that Gonzalez did not do so. Accordingly, the state's common-scheme-or-plan evidence was relevant to both identity and whether the alleged conduct occurred. *See Kennedy*, 585 N.W.2d at 391; *Wermerskirchen*, 497 N.W.2d at 242. The district court did not expressly identify those factual issues, but they may be implied from the whole of the district court's ruling. The district court did not abuse its discretion by not identifying with more specificity the disputed factual issue to which the *Spreigl* evidence is relevant.

Third, Gonzalez contends that the district court erred by reasoning that the potential for unfair prejudice did not outweigh the probative value of the *Spreigl* evidence. The district court stated that B.G.'s testimony had limited potential for unfair prejudice because it concerned an incident that was less serious than the allegations underlying the charged offense because there was no actual sexual contact between Gonzalez and B.G. The district court did not abuse its discretion by ruling that the risk of unfair prejudice was outweighed by the probative value of the evidence.

Thus, the district court did not err by admitting the state's *Spreigl* evidence.

## II. Prosecutorial Misconduct

Gonzalez next argues that the prosecutor engaged in misconduct in statements to the jury, in three ways.

The right to due process of law includes the right to a fair trial. *Spann v. State*, 704 N.W.2d 486, 493 (Minn. 2005); *State v. Ferguson*, 729 N.W.2d 604, 616 (Minn. App.

7

2007), *rev. denied* (Minn. June 19, 2007). "Prosecutors have an affirmative obligation to ensure that a defendant receives a fair trial." *State v. Jones*, 753 N.W.2d 677, 686 (Minn. 2008) (quotation omitted). Consequently, prosecutorial misconduct may result in the denial of the right to a fair trial. *State v. Ramey*, 721 N.W.2d 294, 300 (Minn. 2006).

The parties agree that Gonzalez did not object at trial to the alleged misconduct that he challenges on appeal. Accordingly, we apply the modified plain-error test. *State v. Carridine*, 812 N.W.2d 130, 146 (Minn. 2012). To prevail under the modified plain-error test, an appellant initially must establish that there is prosecutorial misconduct and that it is plain. *Ramey*, 721 N.W.2d at 302. If the appellant establishes plain misconduct, the burden shifts to the state to show that the plain misconduct did not affect the appellant's substantial rights, *i.e.*, "that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (quotation omitted). "If these three prongs are satisfied, the court then assesses whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *State v. Matthews*, 779 N.W.2d 543, 551 (Minn. 2010).

First, Gonzalez contends that the prosecutor engaged in misconduct in closing argument by aligning himself with the jury by using the word "we" when speaking to jurors. At oral argument, Gonzalez's appellate attorney stated that the prosecutor improperly used the word "we" 37 times during closing argument. Gonzalez relies on *State v. Mayhorn*, 720 N.W.2d 776 (Minn. 2006), in which the supreme court stated that "a prosecutor is not a member of the jury" and, thus, may not "describe herself and the jury as a group of which the defendant is not a part." *Id.* at 790.

8

In response, the state acknowledges that some of the prosecutor's uses of the word "we" may have been improper, which we understand to be a limited concession. The state also contends that *Mayhorn* is distinguishable because the prosecutor in that case used the word "we" in the context of what the supreme court described as a possible "attempt[] to highlight cultural differences between the predominantly white jury and the [African American] defendant." *Id.* at 789. Gonzalez agrees that the prosecutor's closing argument in this case was not infected with the improper purpose that was present in *Mayhorn*. The state also responds by citing *Nunn v. State*, 753 N.W.2d 657 (Minn. 2008), in which the supreme court held that the prosecutor did not engage in misconduct because the word "we" "does not necessarily exclude the defendant . . . [and] could reasonably be interpreted . . . to refer to everybody who was in court when the evidence was presented." *Id.* at 663.

We accept the state's limited concession that the prosecutor sometimes used the word "we" in an improper way and, thus, engaged in misconduct. For purposes of this nonprecedential opinion, we assume without deciding that the misconduct was plain. But on most occasions, the prosecutor's use of "we" was more like the statements in *Nunn* than those in *Mayhorn*. On many occasions, the prosecutor simply used the word "we" as an innocuous rhetorical device when describing the evidence presented at trial. Consequently, the prosecutor did not engage in misconduct on the occasions that are not conceded to be misconduct.

Second, Gonzalez contends that the prosecutor engaged in misconduct in both the opening statement and in closing argument by vouching for the credibility of L.B. "A prosecutor may not express a personal opinion regarding witness credibility, but it is not

9

improper for a prosecutor to analyze the evidence and argue that particular witnesses were or were not credible." *State v. Smith*, 825 N.W.2d 131, 139 (Minn. App. 2012) (quotation omitted), *rev. denied* (Minn. Mar. 19, 2013). The prosecutor's statements concerning L.B.'s credibility did not communicate the prosecutor's personal belief about her credibility. Rather, the statements were appropriate ways of attempting to persuade the jury to find L.B. credible.

Third, Gonzalez contends that the prosecutor engaged in misconduct in closing argument by inflaming the passions of the jury by highlighting L.B.'s young age and diminutive size and the fear that she felt during the incident in the woods. A prosecutor is not required to make a colorless argument. *State v. Porter*, 526 N.W.2d 359, 363 (Minn. 1995). Given the charged offense, the state was required to prove that "circumstances existing at the time of the act cause[d] the complainant to have a reasonable fear of imminent great bodily harm to the complainant or another." Minn. Stat. § 609.343, subd. 1(c). The prosecutor's reference to the incident in the woods did not inflame the passions of the jury.

Having identified one form of prosecutorial misconduct that we assume to be plain, we must determine whether Gonzalez is entitled to an appellate remedy. The relevant question is whether the state has satisfied its burden of showing that the misconduct did not affect Gonzalez's substantial rights, *i.e.*, "that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *See Ramey*, 721 N.W.2d at 302 (quotation omitted). "When reviewing claims of prosecutorial misconduct during closing argument, we consider the argument as a whole,

10

rather than focusing on particular phrases or remarks that may be taken out of context or given undue prominence." *State v. Jones*, 753 N.W.2d 677, 691 (Minn. 2008) (quotation omitted).

We believe that there is no reasonable likelihood that the prosecutor's occasional wrongful use of the word "we" had a significant effect on the jury's verdict. Even when using the word "we," the prosecutor's arguments were focused on the evidence and the inferences that may be drawn from the evidence. The jury likely decided the case based on the evidence, not on the prosecutor's "we" statements. L.B. testified in detail about the alleged incidents, and her testimony was corroborated by B.G., who testified that Gonzalez engaged in similar conduct toward her on one occasion. We do not believe that the result would have been different if the prosecutor had not improperly used the word "we" in closing argument.

Thus, Gonzalez is not entitled to a new trial on the ground of prosecutorial misconduct.

### III. Restitution

Gonzalez last argues that the district court erred by ordering him to pay restitution to the county sheriff's office for the expenses it incurred in extraditing Gonzalez from Texas to Minnesota.

In June 2022, shortly after Gonzalez was extradited, the county sheriff's office submitted a letter to the district court administrator stating that it had incurred expenses of $6,800 to extradite Gonzalez from Texas to Minnesota. The sheriff's office requested reimbursement from Gonzalez pursuant to a statute providing that, "upon conviction of the

11

defendant, the court may order as part of the sentence that defendant shall pay the whole or any part of the disbursements of the prosecution, *including disbursements made to extradite a defendant*." Minn. Stat. § 631.48 (2012) (emphasis added).

At the sentencing hearing in August 2023, the prosecutor informed the district court that the county sheriff's office had filed a "restitution affidavit." The district court responded by ordering Gonzalez to pay "$6,800 in restitution to the Olmsted County Sheriff's Department." The district court filed a warrant of commitment that includes "restitution" in the amount of $6,800.

"A victim of a crime has the right to receive restitution as part of the disposition of a criminal charge . . . if the offender is convicted . . . ." Minn. Stat. § 611A.04, subd. 1(a) (2012). The word "victim" is defined within chapter 611A to mean, primarily, "a natural person who incurs loss or harm as a result of a crime." Minn. Stat. § 611A.01(b) (2012). The statutory definition also includes "a government entity that incurs loss or harm as a result of a crime." *Id.* But restitution may be ordered "only for losses that are directly caused by, or follow naturally as a consequence of, the defendant's crime." *State v. Boettcher*, 931 N.W.2d 376, 381 (Minn. 2019).

In this case, the victim of Gonzalez's crime is L.B. The county sheriff's office is not a victim of Gonzalez's crime because it did not sustain a loss directly caused by Gonzalez's crime of criminal sexual conduct. *See State v. Kendall*, No. A05-998, 2006 WL 2129720, *4 (Minn. App. Aug. 1, 2006) (concluding that court administrator and police department were not "direct victims" of crime of driving after cancellation and, thus,

12

not entitled to restitution); *see also* Minn. R. Civ. App. P. 136.01, subd. 1(c) (stating that "nonprecedential opinions may be cited as persuasive authority").

At oral argument, the state cited *State v. Kujak*, 639 N.W.2d 878 (Minn. App. 2002), *rev. denied* (Minn. Mar. 25, 2002), in which this court affirmed a sentencing order that awarded restitution to a drug task force. *Id.* at 885. We acknowledged that "payment of restitution to a drug task force is inappropriate." *Id.* (citing *State v. Murray*, 529 N.W.2d 453, 455-56 (Minn. App. 1995)).[1] We nonetheless affirmed because the district court originally ordered "reimbursement" of the "costs of prosecution" pursuant to section 631.48 but the district court administrator later made a clerical error by referring to the payment obligation as "restitution." *Id.* In this case, however, the district court used the term "restitution" both during the sentencing hearing and in its warrant of commitment, which means that there is no clerical error. For that reason, *Kujak* is distinguishable.

Thus, the district court erred by ordering Gonzalez to pay restitution to the county sheriff's office. Therefore, we reverse that part of Gonzalez's sentence and remand to the district court for resentencing, with instructions to vacate the restitution award.

**Affirmed in part, reversed in part, and remanded.**

---

[1]We note that the restitution statute was amended after *Murray* to allow governmental entities to receive restitution, when appropriate. *See* 1996 Minn. Laws ch. 408, art. 7, §§ 2, 3, 5, at 673-75 (codified at Minn. Stat. §§ 609.10, 609.125, 611A.01(b) (1996)); 1997 Minn. Laws ch. 239, art. 7, § 19, at 2838 (codified at Minn. Stat. § 611A.01(b) (1998)). Those amendments are not relevant to this appeal, in which *Kujak* is cited only for the proposition that a restitution order may be affirmed even if restitution is inappropriate.