STATE of Minnesota, Respondent,

v.

James Robert PORTER, Appellant.

No. C8–93–358.

Supreme Court of Minnesota.

Jan. 13, 1995.

Paul Joseph Lukas, Nichols, Kaster & Anderson, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Richard M. Arney, Washington County Atty., Richard D. Hodsdon, First Asst. Washington County Atty., Stillwater, for respondent.

## OPINION

PAGE, Justice.

James Robert Porter was convicted of three counts of criminal sexual conduct in the fourth degree under Minn.Stat. § 609.345, subd. 1(b) (victim under the age of 16) and three counts of criminal sexual conduct in the fourth degree under Minn.Stat. § 609.345, subd. 1(c) (use of force or coercion to accomplish sexual contact) in a jury trial conducted by Washington County District Court Judge Kenneth J. Maas. The convictions stemmed from a complaint by 21–year–old S.M.D. that Porter sexually assaulted her in 1987 when she was 15 years old. Porter claims he did not receive a fair trial because of prosecutorial misconduct in the state's closing argument. The trial court found that even though the

prosecutor engaged in misconduct, Porter received a fair trial. The court of appeals affirmed the convictions. Porter asserts he is entitled to a new trial on three grounds: first, because the cumulative effect of the prosecutor's misconduct prejudiced his right to a fair trial; next, as a tool to prevent further misconduct; and finally, in the interest of justice. The state contends the prosecutor did not commit misconduct in the closing argument, but to the extent misconduct occurred, it was cured by the trial court's strong curative instruction to the jury. The state also argues that the interests of justice do not warrant a new trial. We conclude the prosecutor engaged in misconduct during the closing argument which denied Porter a fair trial. Because the cumulative effect of the misconduct was not harmless beyond a reasonable doubt, a new trial is warranted. A new trial is also warranted in the interest of justice because the misconduct was intentional, serious, and an attack on juror independence. We reverse the court of appeals and remand for a new trial.

S.M.D. is unable to pinpoint when she began baby-sitting for James and Verlyne Porter's children, but believes it was either 1985 or 1986, when she was 13 or 14 years old. S.M.D. testified that she baby-sat for the Porters one to two times a week between then and August 1987 and that on one or two occasions her younger sister, T.L.D., accompanied her.

In August 1992, S.M.D. filed a report with the Oakdale police accusing Porter of fourth-degree criminal sexual conduct stemming from three sexual assaults [1] which she claims occurred while she baby-sat in the Porter home between May and August of 1987. According to S.M.D., each of these sexual assaults occurred on occasions when Porter remained at home while she was baby-sitting. Each assault consisted of Porter rubbing his hands through S.M.D.'s hair and touching her breasts, vaginal area, and inner thighs through her clothing while telling her how beautiful she was, that all kids knew about sex before they reached puberty, and that what he was doing was okay. Each time when S.M.D. attempted to get away, Porter held her down. During one of the assaults, Porter's hands made direct contact with the skin on S.M.D.'s back and, during another, he pushed against her with an erection and had his buttocks exposed. Each assault ended when S.M.D. was finally able to push Porter away and run from the house. She continued baby-sitting for the Porters until the August 1987 assault. S.M.D. testified that at the time she knew what Porter was doing was not right, but never told anyone that he was molesting her because she was afraid.

Approximately one month after she stopped baby-sitting for the Porters, S.M.D. told her mother not to allow T.L.D. to baby-sit for the Porter's because Porter was a "pervert." She did not explain to her mother what she meant by calling Porter a "pervert," and apparently her mother did not ask. The first time S.M.D. informed anyone that Porter had molested her was in mid-August 1992 when she told both her boy friend and her older sister, A.M.D.

On July 23, 1992, A.M.D. appeared on the national television program "Prime Time Live" claiming Porter sexually assaulted her when she baby-sat for the Porter children in the early 1980's. S.M.D. testified she did not know of A.M.D.'s accusations against Porter until she saw her on "Prime Time Live." [2] S.M.D. sent Porter a letter in which she expressed her anger for the pain he caused his victims, for making it hard for strong faithful Catholics to believe what priests stand for, and because she was angry at what Porter had done to A.M.D. [3] While question-

1. S.M.D. claimed in her testimony that on several occasions prior to May 1987 Porter fondled her after she bathed the Porter children. This fondling did not result in criminal charges against Porter because it occurred outside the statute of limitations.

2. She also testified she may have learned of A.M.D.'s accusations against Porter in a phone conversation with A.M.D. approximately one month prior to the television program.

3. The letter, dated July 23, 1992, reads:
 Jim-
 I just want you to know how upset I am by you messing around with my sister! You had no right!! You say you *were* a very sick man??! I must correct you and let you know that you

ing Porter's intentions towards her, the letter makes no reference to Porter molesting S.M.D. nor did it indicate that she was angry because he had molested her. During her testimony, S.M.D. could not explain why the letter did not express anger at Porter for molesting her.

The defense theory of the case was that S.M.D.'s charges against Porter lacked credibility in that they were five years old, had never been reported to anyone, were filled with inconsistencies, and arose only after S.M.D. learned of A.M.D.'s accusations against Porter. The defense contends that S.M.D.'s testimony at trial was internally inconsistent as well as inconsistent with a number of the other witnesses.

At trial, Porter exercised his constitutional right and did not testify. Verlyne Porter did testify and contradicted S.M.D.'s testimony on a number of key points. She testified: S.M.D. never baby-sat for her children in the summer of 1987; S.M.D. baby-sat for the Porters at most six times and, with one exception, was accompanied by her younger sister; baby-sitters never had to bathe her children; and she could not remember a time when Porter remained home with a baby-sitter.

Due to extensive, negative pre-trial publicity, Porter was concerned he would not receive a fair trial. The pre-trial publicity centered on allegations that Porter sexually molested children while a Roman Catholic priest during the 1960's and 1970's.[4] Porter moved for and was granted a change of venue because of the pre-trial publicity. Even with the venue change, jurors selected for the trial were aware of the negative publicity.

■■■ As we have said many times, a prosecutor may not seek a conviction at any

are, and until you admit *all* the messing around you did, you are still very, very sick!!

All those little perverted things you said to me I thought you were just being nice, the pats on the butt seemed to be like a pat on the back; when I took a bath with your children—what was on your mind?; why did you always offer to walk us home after babysitting?; the kisses when arriving at your house were no more than a friendly "Hello" to *me*—what about you?!; why when you you [sic] asked us to babysit you were home sometimes and you always wanted a backrub? Why? What was going through your mind? I can now see what was going on then. I would have never guessed that you were being a sick-minded person. And . . . now I realize what was really going on. You were sick and still are.

What do your children think? How can they look up to you? Why would any child want to admit that you are their father!? I know I sure would *not* be proud of a dad who molested and/or raped some 100 girls and boys!!

You, like many other sick former and current priests of the Catholic religion sure are making it hard for us strongly, faithful, Catholics to believe what the priest stands for!!

It just upsets me so bad to be able to see what you were really up to back then and not see it until now!! Although don't even think for one millisecond that you ruined my life because you sure didn't! I wouldn't ever let anyone ruin my life especially you, a sick man! You are a man full of lies and will never admit to all the wrongful things you've done or said in the sick manner you did them in!

I am greatful [sic] that you quit the priesthood because you couldn't handle not being able to have sex. *But*!! sex with children is totally ridiculous! That's so sick! You have caused so many children and their parents so much pain! You don't even sound sorry for the things you did! You must realize the pain people, *your* victims, are going through. I guess I just don't see how you can live with yourself after you see all the victims come out! I don't see why you can't act sorry for all the crap you have done!! There are so many people who are angry and so very upset with you!

You just have to see what is going through everyone's mind! Do you realize how many boys you have betrayed as a priest. They wanted to trust in Fr. Porter because he was a great man. "Who can you trust if you can't trust a priest?" Well now I guess I'll have to think about that question! You have lost a lot of people that you could actually call your friends.

There will come a day when you will be judged for who you are and you better get help and do a lot of talking to God! He is the one who will choose what's going to happen to you! You better keep praying because if I pray harder than you, you aren't going to like your "Judgment Day!!"

S.M.D.

4. This pre-trial publicity included the "Prime Time Live" television program, articles in *Newsweek* and *People* magazines, *The New York Times*, the *Oakdale–Lake Elmo Review*, the *Oakdale Newspaper*, and at least 9 articles in the *Minneapolis Star Tribune* and 13 articles in the *St. Paul Pioneer Press* about Porter. In addition, the *Minneapolis Star Tribune* carried one article and the *Saint Paul Pioneer Press* carried eight articles about sexual abuse of children by the clergy.

price. *State v. Salitros,* 499 N.W.2d 815, 817 (Minn.1993). The prosecutor must avoid inflaming the jury's passions and prejudices against the defendant. *State v. Morgan,* 235 Minn. 388, 391, 51 N.W.2d 61, 63 (1952). We will pay special attention to statements that may inflame or prejudice the jury where credibility is a central issue. *See State v. Turnbull,* 267 Minn. 428, 435, 127 N.W.2d 157, 162 (1964).

 As the basis for his claim that the prosecutor's closing argument denied him a fair trial, Porter raises a number of issues. Porter first asserts the following statements from the argument were improper because they inflamed the passions and prejudices of the jury:

1. What you have here—let's get right down to it—what you have here is the decisions you have to make. There is *no salve you can put on your conscience;* maybe somebody of the prosecution's witnesses was just slightly mistaken. We are not sure, so that is reasonable doubt. *Now you are not going to be able to walk out and have that kind of a sedative to make you feel better if you arrive at the wrong verdict.* By wrong verdict I mean you don't convict this man, because what you have here is a fundamental decision you have to make.

2. [I]f you want a fallback position from the defense perspective, you might even say she didn't make it up. It happened, but she is lying about when it happened. This stuff maybe did happen to her, but it happened back in 1984. If you are not convinced it happened in 1987, then you have to acquit my client. *Okay, so then the jurors are going to be able to feel real good about themselves and say,* well, something probably happened, and we don't want to call [S.M.D.] a liar or a leader in a conspiracy. In our minds, we will acquit the defendant, figure it didn't happen or it happened but not when they said, so everybody goes away happy. It doesn't work that way.

3. [Verlyne Porter's] testimony is without any credibility whatsoever. There is

no other evidence presented on behalf of the defense that establishes the baby sitting by [S.M.D.] ended in 1984. Of course Verlyne Porter is absolutely convinced of the fact that 1984 was beyond the statute of limitations has nothing to do with the quality of her recollections. *Do you believe that? If you do and this is over, I got time share in Santa Claus's condo at the north pole, and I will sell you some. You are not that big of suckers, and you know that.*

(Emphasis added.) Porter also claims the prosecutor engaged in misconduct during the closing argument by repeatedly referring to the "James Porter School of Sex Education" even though there was no evidence of any such school admitted at trial. Review of the record reveals the prosecutor referred to the James Porter School of Sex Education at least seven times during closing argument. Porter asserts the repeated references to the school were intended to remind the jurors of allegations that he sexually molested children when he was a priest and to reinforce the message that the jurors could not, without being suckers, or needing a sedative or salve, feel good about acquitting him.

The state responds that, when viewed in the context of the entire argument, the prosecutor's statements were nothing more than the use of colorful language and a correct anticipation of the defense's final argument. In addition, the state argues that its reference to the James Porter School of Sex Education was a fair comment and inference based upon evidence produced at trial.

The trial court determined that the prosecutor's statements were an improper attempt to evoke an emotional reaction from the jurors and the court of appeals affirmed. The trial court found the references to the "school" to be offensive, unprofessional, a "twisted and distorted view" of the testimony, and misconduct. The court of appeals agreed.

 While the state's argument need not be "colorless," it must be based on the evidence produced at trial, or the reasonable inferences from that evidence. *State v. Gul-*

*brandsen,* 238 Minn. 508, 511, 57 N.W.2d 419, 422 (1953). The statements in question here could only have been intended to inflame the jury's passions and prejudices and suggest to them the negative consequences of acquitting Porter. For the prosecutor to tell the jurors that he had time share in Santa's condo, they were not that big of suckers, and that there was no salve or sedative to make them feel good about acquitting Porter, was more than the use of colorful language. The statements were a blatant attempt to impinge on juror independence. The prosecutor's references to the James Porter School of Sex Education were not based on any evidence produced at trial, nor were they based on any reasonable inference which could be drawn from the evidence produced at trial.

■ Next, Porter contends the state's closing argument improperly bolstered the credibility of the state's child sexual abuse expert, Dr. Sandra Hewitt, and misled the jury as to the weight to be given her testimony. The state argues that it merely commented on Dr. Hewitt's credibility based on her testimony at trial. Referring to Dr. Hewitt in closing argument, the prosecutor stated:

> She gave you her professional credentials, and they are impeccable and unimpeached. * * * She said:
>
>> I don't need to study S.M.D. I don't need to shrink her head and do an evaluation. I have a professional expertise that the judges of this state and the federal judges have recognized and are impressed enough with that I can render a valid opinion on that very issue * * *.

The trial court found that while the prosecutor's comments concerning Dr. Hewitt "approach[ed] the outer bounds of permissible argument" there was no misconduct. The court of appeals concluded the comments were a personal endorsement of Dr. Hewitt's veracity and constituted misconduct.

■ It is improper for a prosecutor in closing argument to personally endorse the credibility of witnesses. *See State v. Parker,*

353 N.W.2d 122, 128 (Minn.1984). When referring to Dr. Hewitt's professional credentials during the closing argument, the prosecutor misquoted her testimony and implied that she had received special recognition as an expert by both state and federal judges. In doing so, the prosecutor sought to personally enhance Dr. Hewitt's credibility. This was misconduct. The record reflects that Dr. Hewitt testified as an expert witness in an unspecified number of child sexual abuse cases in both state and federal courts and had on one occasion been involved in training judges on child sexual abuse at a judicial retreat. It does not reflect that Dr. Hewitt received any special recognition by state or federal judges or that any state or federal judges were particularly impressed with her background or credentials. Further, Dr. Hewitt never testified that she did not need to study, evaluate, or shrink S.M.D.'s head.

■ Porter's final claim is that the prosecutor committed misconduct by making direct and indirect references to Porter's failure to put on a defense and testify at trial and impeach one of the state's witnesses. Specifically Porter asserts that the prosecutor made reference to his failure to put on a defense and testify by repeatedly pointing at him while commenting on his guilt and referred to his failure to impeach one of the state's witnesses by using the phrase "without impeachment by any cross-examination." [5]

While conceding that the prosecutor may have pointed at Porter during the closing argument, the state asserts this did not constitute misconduct because the prosecutor pointed at numerous other persons and objects during the argument. On the record before us, we cannot determine whether the prosecutor's pointing was misconduct. As to the prosecution's references to Porter's failure to impeach one of the state's witnesses, the state argues that it used the phrase "without impeachment by any cross-examination" when referring to the testimony rather than the statement that the testimony was "uncontradicted." The state implies that use

---

5. The phrase in context appears as follows:
 As the judge will instruct you and instructed you, this man is not on trial for sexually molesting [A.M.D.], but you can consider the evidence she presented to you under oath from this witness stand without, I might add, impeachment by any cross examination what [sic] happened to her.

of the term "uncontradicted" would have been misconduct, while the phrase "without impeachment by any cross-examination" was not.

■ A prosecutor may not comment on a defendant's failure to call witnesses or to contradict testimony. *State v. Gassler,* 505 N.W.2d 62, 69 (Minn.1993). One rationale for the rule is that a comment of this nature may suggest to the jury that the defendant bears some burden of proof. *State v. Caron,* 300 Minn. 123, 127, 218 N.W.2d 197, 200 (1974). Another reason is that the comment might "erroneously suggest to the jury that defendant did not call the witnesses because he knew their testimony would be unfavorable." *Id.* Whether the phrase "without impeachment by any cross-examination" is used or reference is made to the testimony being "uncontradicted" the harm to be avoided is the same. Both phrases constitute misconduct.

We conclude the prosecutor improperly: appealed to the passions and prejudices of the jury, argued the consequences of the jury's verdict, bolstered the credibility of the state's expert witness, distorted the state's burden of proof, and committed misconduct by alluding to Porter's failure to contradict certain testimony. This misconduct permeated the entire closing argument and appears to have been intended to play on the jurors' emotions and fears. To the extent that the closing argument suggested to the jurors that they would be suckers if they acquitted Porter and there would be no sedative or salve to make them feel better, the misconduct struck at the heart of the jury system, juror independence. This is particularly disturbing because the prosecutor involved is a veteran of the courts with years of experience and knew or should have known the impact this argument could have on the jury.

■ Prosecutorial misconduct does not in and of itself require that the defendant be granted a new trial. *State v. Scruggs,* 421 N.W.2d 707, 715–16 (Minn.1988) (citing *State v. Johnson,* 307 Minn. 501, 509, 239 N.W.2d 239, 244 (1976)). Where misconduct has been established, we must still determine whether the defendant was denied a fair trial. *Id.* The defendant is not entitled to a new trial where it can be said with certainty that the misconduct was harmless beyond a reasonable doubt. *State v. Boitnott,* 443 N.W.2d 527, 534 (Minn.1989) (citing *State v. Caron,* 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974)). The evidence against Porter was not overwhelming and the case came down to the credibility of the witnesses. The jury deliberated for portions of three days before reaching a verdict. Given the evidence produced, the length of the jury's deliberations, and the negative pre-trial publicity, we are unable to say with any certainty that the prosecutor's misconduct was harmless beyond a reasonable doubt.

■ The state argues that any possible harm caused by the prosecutor's statements was cured by the strong curative instruction given by the trial court. However, once the jury's prejudices or passions have been invoked, a cautionary instruction may not be sufficient to undo the damage, *State v. Turnbull,* 267 Minn. 428, 435, 127 N.W.2d 157, 162 (1964),[6] particularly, where as here, the trial court's curative instruction, while strong, addressed some but not all of the misconduct. It is unlikely the cautionary instruction given could undo the damage done by the misconduct. In addition, it is questionable whether the curative instruction hurt more than it helped, as it again focused the jury's atten-

---

**6.** In *State v. Turnbull,* 267 Minn. 428, 127 N.W.2d 157 (1964), defendant was convicted of an indecent assault on a 9–year–old girl. We determined that where the ultimate issue was the credibility of the defendant or the complaining witness and the prosecutor's statements in closing argument may have had the effect of inflaming or prejudicing the jury, a new trial was required. *Id.* at 435, 127 N.W.2d at 162. While acknowledging it did not occur in the case at hand, the prosecutor's statements in closing argument included language that often adult molesters will "do away with the child" to cover their tracks. *Id.* at 430, 435, 127 N.W.2d at 159. We held that it was "doubtful if a cautionary instruction by the court" could undo the damage. *Id.* at 435, 127 N.W.2d at 162. In *State v. Perry,* 274 Minn. 1, 142 N.W.2d 573 (1966), where the prosecutor stated that the defendant was the type of person who prowled at night, and if the jurors wanted to keep the streets safe and sleep at night, they had to convict, we held that it was unlikely the instruction could negate the harm caused by the prosecutor's statements. *Id.* at 14, 142 N.W.2d at 581.

tion on the inflammatory statements. Because the prosecutor engaged in serious misconduct which we cannot say with certainty was harmless beyond a reasonable doubt, we reverse Porter's conviction and remand for a new trial.

We also choose to exercise our supervisory powers. In *State v. Salitros*, 499 N.W.2d 815 (Minn.1993), we stated prosecutorial misconduct may result in a new trial where the interest of justice so requires. Normally, where we have already determined that the defendant is entitled to a new trial, we would not need to exercise our supervisory powers. However, because the misconduct here was directed at the very heart of the jury system, we must comment. To have a prosecutor suggest that jurors would be suckers for acquitting a defendant or that no salve or sedative would be able to make them feel good if they were to acquit a defendant, is intolerable. We say again—a prosecutor may not seek a conviction at any price. *Id.* at 817. In the exercise of our supervisory powers and in the interest of justice, we reverse Porter's conviction and remand for a new trial.

Reversed and remanded for a new trial.

TOMLJANOVICH, J., took no part in the consideration or decision of this case.