*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A24-1694**

State of Minnesota,
Respondent,

vs.

Casey Love,
Appellant.

**Filed June 15, 2026
Affirmed
Johnson, Judge**

Redwood County District Court
File No. 64-CR-22-47

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Shannon Ness, Redwood County Attorney, Marissa Pacheco, Assistant County Attorney, Redwood Falls, Minnesota; and

Travis J. Smith, Special Assistant County Attorney, Slayton, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Schmidt, Presiding Judge; Johnson, Judge; and Larson, Judge.

**NONPRECEDENTIAL OPINION**

**JOHNSON**, Judge

A Redwood County jury found Casey Love guilty of several crimes based on evidence that he physically attacked a woman and put his hand inside her underwear. We

conclude that Love did not receive ineffective assistance of counsel in connection with his attempt to remove the assigned judge. We also conclude that Love is not entitled to a new trial due to prosecutorial misconduct. We further conclude that the district court did not err at sentencing in its award of custody credit. Therefore, we affirm.

## FACTS

In January 2022, Casey Love approached F.P. in the parking lot of a gas station in the city of Redwood Falls and asked for a ride to a nearby liquor store. F.P. gave Love a ride to the liquor store and then a ride to his apartment. She also gave him her telephone number and said that he could call her to ask her for rides in the future. F.P. gave Love rides to the liquor store on five occasions.

On the fifth occasion, Love asked F.P. whether she wanted to go inside his home for a drink. She initially declined but then agreed. Love and F.P. talked until approximately 2:30 a.m., during which time F.P. drank three beers while Love drank vodka. Love talked about his wife, May, who had died. He drew a picture of his wife and cried.

F.P. decided to stay overnight at Love's home because she had been drinking and it was snowing. Love said that F.P. could sleep on his bed and that he would sleep in the living room. But Love ended up sitting on the bed next to F.P. and watching television throughout the night. F.P. testified that Love continually fidgeted and tapped his knees as if he were nervous. F.P. wrapped herself up in a quilt and fell asleep.

F.P. awoke at approximately 9:00 a.m. and decided to go home. Love got on the bed and tried to pull the quilt off F.P. and remove her pants. F.P. resisted by wrapping

2

herself tighter in the quilt. Love then stood in the doorway of the bedroom, blocking F.P.'s exit. F.P. tried to deescalate the situation by saying that she was going to have a cigarette and then leave.

When F.P. reached for a lighter, Love grabbed her arm and threw her into the headboard. F.P. could tell that Love was "really drunk." Love put F.P. in a chokehold, and F.P. heard her neck crack. Love held F.P. down by putting his knee on her pelvis. While doing so, Love called her "May," the name of his deceased wife. Love put his hand inside F.P.'s underwear, but she got away by kicking him and pushing him away. F.P. ran to the kitchen and grabbed a knife. She told Love to get back and to throw her coat and purse to her. She backed out of the apartment, threw the knife into the kitchen sink, and ran to her car.

In the days that followed, F.P. spoke with Love by telephone because she wanted to ask why he did what he did or to "get a confession." Love angrily said that he "didn't do anything." Within a week of the incident, F.P. made a report to law enforcement.

The state charged Love in an amended complaint with eight offenses: (1) attempted second-degree criminal sexual conduct causing fear of great bodily harm, in violation of Minn. Stat. § 609.343, subd. 1(a) (Supp. 2021); (2) attempted second-degree criminal sexual conduct causing personal injury and using force, in violation of Minn. Stat. § 609.343, subd. 1(c)(ii); (3) attempted second-degree criminal sexual conduct causing injury to a person known to be physically helpless, in violation of Minn. Stat. § 609.343, subd. 1(c)(iii); (4) attempted second-degree criminal sexual conduct using force, in violation of Minn. Stat. § 609.343, subd. 1(d); (5) second-degree assault with a dangerous

weapon causing substantial bodily harm, in violation of Minn. Stat. § 609.222, subd. 2 (2020); (6) second-degree assault with a dangerous weapon, in violation of Minn. Stat. § 609.222, subd. 1; (7) third-degree assault, in violation of Minn. Stat. § 609.223, subd. 1 (2020); and (8) fifth-degree assault, in violation of Minn. Stat. § 609.224, subd. 1(2) (2020).  At a pre-trial conference, the state voluntarily dismissed count 3.

The case was tried to a jury on three days in May 2024.  The state called ten witnesses, including F.P., who testified to the facts described above.  Love did not testify and did not introduce any other evidence.  The jury found Love guilty of the charges in counts 1, 2, 4, 6, and 8 and not guilty of the charges in counts 5 and 7.  The district court imposed a sentence of 53 months of imprisonment, with 49 days of custody credit, on count 2.

Love filed a notice of appeal and a motion to stay the appeal so that he could pursue postconviction relief.  This court granted the motion.  *See* Minn. R. Crim. P. 28.02, subd. 4(4).  In his postconviction petition, Love alleged claims related to the denial of his notice to remove the assigned judge.  The postconviction court (with a different judge presiding) denied the petition in an order filed in October 2025.  This court dissolved the stay, and the parties filed their appellate briefs.

**DECISION**

With the assistance of appellate counsel, Love makes two arguments for reversal and a new trial.  Love also has filed a *pro se* supplemental brief in which he makes one additional argument.

4

# I. Notice to Remove

Love first argues that the postconviction court erred by denying his postconviction petition. His argument has two parts. He first contends that the assigned judge erred by denying his notice to remove and by continuing to preside over the case. He also contends that he received ineffective assistance of counsel because his trial attorney did not file a petition for a writ of prohibition to challenge the district court's denial of his notice to remove.

This issue arose at an early stage of district court proceedings. On January 26, 2022, the same day on which the complaint was filed, the district court administrator gave notice to the parties that a rule 8 hearing had been scheduled for February 7, 2022, and that a particular district court judge would preside. The next day, the assigned judge signed an order releasing Love from pre-trial detention on a furlough for medical treatment. Love returned to jail but experienced a second medical emergency, which required treatment at a local hospital and transport to a hospital in St. Cloud. On February 5, 2022, two days before the scheduled rule 8 hearing, the assigned judge signed a second order releasing Love on a second furlough for additional medical treatment. On February 7, 2022, the day for which the rule 8 hearing had been scheduled, the state requested that the district court continue the rule 8 hearing.

On February 8, 2022, the district court administrator gave notice to the parties that the rule 8 hearing had been rescheduled for March 7, 2022, and that the same judge would preside. Two days later, Love filed a notice to remove the assigned judge. On March 8, 2022, the assigned judge signed an order granting Love's notice to remove. Two days after

that, the state filed an objection to Love's notice to remove, stating that the notice was untimely because it was not filed within seven days of the district court administrator's January 26, 2022 notice of the scheduling of a rule 8 hearing. The assigned judge filed an order "toll[ing]" the March 8, 2022 order and scheduled a hearing on the state's objection. At that hearing, Love's trial attorney argued that the notice to remove was timely because it was filed two days after the district court administrator's February 8, 2022 notice that the rule 8 hearing had been rescheduled. In late April 2022, the assigned judge filed an order denying Love's notice to remove, reasoning that the notice was filed more than seven days after the first notice of the rule 8 hearing. The assigned judge reasoned that the seven-day period does not apply to a notice of a rescheduled hearing except "in situations in which a new/different judge is assigned to a matter."

In his postconviction petition, Love alleged that the first assigned judge erred by denying his notice to remove and by continuing to preside over the case, and he further alleged that he received ineffective assistance of counsel because his trial attorney did not file a petition for a writ of prohibition with this court to challenge the assigned judge's denial of his notice to remove. Love submitted a declaration of his trial attorney, who stated that he was unaware that a petition for a writ of prohibition is the proper way to challenge a district court's denial of a notice to remove. The postconviction court (with a different judge presiding) denied relief, reasoning that the first assigned judge did not err by denying the notice to remove and that Love had not established that, if his trial attorney had filed a petition for a writ of prohibition, it would have been granted.

6

## A. Denial of Notice to Remove

Love begins by challenging the first assigned judge's denial of his notice to remove and the fact that the judge continued to preside over the case. In response, the state argues that Love's challenge to the first assigned judge's denial of his notice to remove has been forfeited because Love did not challenge the denial in a petition for a writ of prohibition. The state is correct. The supreme court has held that the proper means of challenging the denial of a notice to remove a judge is a petition for a writ of prohibition. *State v. Dahlin*, 753 N.W.2d 300, 303 (Minn. 2008). In addition, "a defendant's failure to seek a writ of prohibition constitutes waiver of further appellate review when the issue involves the right of peremptory removal." *Hooper v. State*, 838 N.W.2d 775, 789 n.4 (Minn. 2013) (emphasis omitted) (quotation omitted). Thus, the first part of Love's argument has been forfeited.

## B. Ineffective-Assistance Claim

Love also challenges the postconviction court's denial of his claim of ineffective assistance of counsel.

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *see also* Minn. Const. art. I, § 6. To prevail on a claim of ineffective assistance of counsel, a defendant usually must satisfy two requirements: "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Cram*, 718 N.W.2d 898, 906-07 (Minn. 2006). The first *Strickland* requirement is concerned with whether an attorney's performance fell below an

7

objective standard of reasonableness.  *Strickland*, 466 U.S. at 687-88; *State v. Vang*, 847 N.W.2d 248, 266-67 (Minn. 2014).  The "objective standard is defined as 'representation by an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances.'"  *Opsahl v. State*, 677 N.W.2d 414, 421 (Minn. 2004) (quoting *State v. Gassler*, 505 N.W.2d 62, 70 (Minn. 1993)).  The second *Strickland* requirement requires "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Gates v. State*, 398 N.W.2d 558, 561 (Minn. 1987) (quoting *Strickland*, 466 U.S. at 694).  If either one of the *Strickland* requirements is not satisfied, a court need not consider the other requirement.  *State v. Mosley*, 895 N.W.2d 585, 591 (Minn. 2017).

Love's postconviction claim hinges on an interpretation of the procedural rule concerning a party's right to remove an assigned district court judge, which provides:

> A party may remove a judge assigned to preside at a trial or hearing as follows:
>
> (a)    A notice to remove must be served on the opposing counsel and filed with district court *within seven days after the party receives notice of the name of the presiding judge at the trial or hearing*;
>
> (b)    The notice must be filed before the start of the trial or hearing; and
>
> (c)    The notice is not effective against a judge who already presided at the trial, Omnibus Hearing, or evidentiary hearing if the removing party had notice the judge would preside at the hearing.

Minn. R. Crim. P. 26.03, subd. 14(4) (emphasis added).

Love contends that his notice to remove was timely because he filed it two days after the district court administrator gave notice that the rule 8 hearing had been rescheduled to March 7, 2022. In contrast, the state contends that the notice to remove was untimely because Love filed it more than seven days after the district court administrator gave notice that the rule 8 hearing initially had been scheduled for February 7, 2022. The question framed by the parties is, in essence, whether the seven-day period in which to file a notice to remove pursuant to rule 26.03, subdivision 14(4)(a), restarts if a hearing is rescheduled but the assigned judge remains the same.

The text of the applicable rule is focused on the date on which the removing party "receives notice of *the name of the presiding judge* at the trial or hearing." Minn. R. Crim. P. 26.03, subd. 14(4)(a) (emphasis added). For purposes of a notice to remove, the identity of the presiding judge is the important part of the notice. In this case, Love first learned that the assigned judge would preside at the rule 8 hearing when the district court administrator initially gave notice on January 26, 2022, of the scheduling of the rule 8 hearing. Love did not file a notice to remove within seven days of receiving that notice. It is immaterial that the date of the rule 8 hearing later changed because of a need to reschedule. Thus, Love's notice to remove dated February 10, 2022, was untimely.

Because Love's notice to remove was untimely, he cannot establish the second requirement of the *Strickland* test, which requires "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Gates*, 398 N.W.2d at 561 (quoting *Strickland*, 466 U.S. at 694). Because Love cannot

satisfy the second *Strickland* requirement, we need not consider whether he can satisfy the first requirement. *See Mosley*, 895 N.W.2d at 591.

Thus, the postconviction court did not err by rejecting Love's claim of ineffective assistance of counsel or by denying his postconviction petition.

## II. Prosecutorial Misconduct

Love also argues that he is entitled to a new trial on the ground that the prosecutor engaged in prosecutorial misconduct during closing arguments.

The right to due process includes the right to a fair trial. *State v. Duol*, 25 N.W.3d 135, 141 (Minn. 2025). "Prosecutors have an affirmative obligation to ensure that a defendant receives a fair trial." *State v. Jones*, 753 N.W.2d 677, 686 (Minn. 2008) (quotation omitted). Consequently, prosecutorial misconduct may result in the denial of a fair trial. *State v. Ramey*, 721 N.W.2d 294, 300 (Minn. 2006). "A prosecutor engages in prosecutorial misconduct when he violates clear or established standards of conduct, e.g., rules, laws, orders by a district court, or clear commands in this state's case law." *State v. McCray*, 753 N.W.2d 746, 751 (Minn. 2008) (quotation omitted).

Love challenges several statements in the prosecutor's closing arguments, most of which were made in rebuttal argument. Love did not object in the district court to any of the challenged statements. Accordingly, we apply the modified plain-error test. *See State v. Carridine*, 812 N.W.2d 130, 146 (Minn. 2012); *see also* Minn. R. Crim. P. 31.02. To prevail under the modified plain-error test, an appellant first must establish that an error occurred. *Ramey*, 721 N.W.2d at 302. The appellant then must show that the error was plain. *Id.* At the third step of the modified plain-error test, the burden shifts to the state to

show "that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (quotations omitted). If the state does not satisfy that burden, the appellate court proceeds to the fourth step to determine whether the plain misconduct should result in a new trial to ensure the "fairness, integrity, or public reputation of judicial proceedings." *State v. Portillo*, 998 N.W.2d 242, 248 (Minn. 2023) (quotation omitted).

Love contends that the prosecutor engaged in prosecutorial misconduct in six ways during closing arguments.

## A.     Burden of Proof

Love first argues that the prosecutor misstated the burden of proof by urging jurors to "presume" that the victim testified truthfully. He compares this case to *Portillo*, in which the supreme court determined that the prosecutor committed misconduct by stating that the defendant had "lost the presumption of innocence." *See* 998 N.W.2d at 248-50. In response, the state contends that this case is more similar to *State v. Fields*, 730 N.W.2d 777 (Minn. 2007), in which the supreme court determined that the prosecutor did not commit misconduct by suggesting that the appellant could not explain why the victim would lie about being raped. *Id*. at 785-86.

It is helpful to put the prosecutor's alleged misstatement in context. In the defense closing argument, Love's trial attorney argued that F.P. was not a credible witness because her story was "constantly changing" and was inconsistent with other evidence and with the statement she gave to a police officer shortly after the incident. In rebuttal argument, the prosecutor replied to that argument as follows:

> What more can a victim do, who was assaulted, than what she's already done. She came into a court of law, she took an oath and told you, as a jury, what her attacker did to her. Why shouldn't you believe her? She didn't just tell you she was attacked by the Defendant. She reported it to law enforcement, to her doctors, she talked about the abuse, to a therapist, she asked for a protective order. Should you automatically believe her? No, but should you automatically doubt her? No. It's hard enough for her to talk about this humiliating experience. *Why would you not presume, presume it was true, unless she had a really good reason to believe it wasn't.* In this case, there's no reason. There's no motivation. There's nothing to gain. (Emphasis added.)

This argument is similar to the argument in *Fields*, which the supreme court characterized as "discuss[ing] the credibility of witnesses in the context of the evidence before the court and the conclusions that can be drawn from that evidence." *See* 730 N.W.2d at 786. The comments are unlike the argument in *Portillo*, in which the prosecutor referred more directly to the burden of proof by discussing the "presumption of innocence" and arguing that the defendant "no longer has that presumption." *See* 998 N.W.2d at 246-47. In this case, the prosecutor did not expressly refer to either the presumption of innocence or the state's burden of proof. The prosecutor used the word "presume" but in a different way, to urge the jury to find a witness credible despite the arguments of defense counsel, not to urge the jury to misapply the presumption of innocence. Thus, the prosecutor did not engage in plain misconduct by urging jurors to "presume" that F.P. testified truthfully.

**B.     Right to Confront Witnesses**

Love next argues that the prosecutor engaged in plain misconduct by violating his Sixth Amendment right of confrontation when she criticized defense counsel's cross-examination of F.P.

As an initial matter, we note that Love's argument relies on an opinion issued by a court of another state.  *See People v. Mpulamasaka*, 48 N.E.3d 853, 887 (Ill. App. Ct. 2016).  To the extent that Love relies on principles that have not been adopted in Minnesota, his argument necessarily fails because he cannot establish that any misconduct is "plain." *See McCray*, 753 N.W.2d at 751.

Nonetheless, this court has recognized that criminal defendants have a constitutional right "to confront witnesses against" them and that "[i]t is misconduct for a prosecutor . . . to encourage the jury to punish [the defendant] for what the prosecutor perceives as further victimization of the victim."  *State v. McNeil*, 658 N.W.2d 228, 235 (Minn. App. 2003). The appellant in *McNeil* argued that the prosecutor committed misconduct by criticizing the defense for forcing the victim to testify, alleging that appellant "put her through this, shamed her for never telling anyone," and victimized her "all over again."  *Id*.  We agreed and concluded that the comment was "simply wrong."  *Id*.

The state contends that *McNeil* is distinguishable because, in this case, the prosecutor did not criticize Love simply for cross-examining F.P.  Rather, the state contends, the prosecutor "asked the jury to consider the manner in which F.P. testified on direct examination as opposed to how she testified during cross examination, find her testimony on direct credible, and disregard any inconsistencies defense counsel highlighted

during cross examination as irrelevant." The state's argument has merit. The prosecutor asked the jury to recall F.P.'s testimony on direct examination and to view F.P.'s testimony on cross-examination in light of defense counsel's use of leading and repetitive questions. Such an argument is a fair comment on the evidence introduced at trial. *See State v. Roman Nose*, 667 N.W.2d 386, 402-03 (Minn. 2003).

The prosecutor did not violate Love's Sixth Amendment right of confrontation and did not engage in plain misconduct by arguing that jurors should consider F.P.'s testimony on cross-examination in light of her testimony on direct examination.

## C.    Disparaging Defense Counsel

Love next argues that the prosecutor disparaged defense counsel by stating that Love's trial attorney's "purpose" was "to frustrate and confuse the victim"; by blaming defense counsel for inconsistencies in F.P.'s testimony; and stating that defense counsel "meant to distract" the jury.

It is misconduct for a prosecutor to disparage or belittle the defense. *State v. McDaniel*, 777 N.W.2d 739, 752 (Minn. 2010); *State v. Washington*, 725 N.W.2d 125, 134 (Minn. App. 2006), *rev. denied* (Minn. Mar. 20, 2007); *State v. Hoppe*, 641 N.W.2d 315, 321 (Minn. App. 2002), *rev. denied* (Minn. May 14, 2002). A prosecutor may argue that the evidence does not support the defense's theory of the case, but a prosecutor may not make a "personal attack" by accusing a defense attorney of intentionally misrepresenting a fact or trying to deceive the jury. *See McDaniel*, 777 N.W.2d at 751-753; *Hoppe*, 641 N.W.2d at 321.

14

In this case, the prosecutor accused Love's trial attorney of trying to mislead or deceive the jury by saying that defense counsel acted with the "purpose" of trying to "frustrate and confuse" F.P. and to "distract" the jury. We conclude that the prosecutor engaged in plain misconduct by disparaging defense counsel.

**D.     Alignment with Victim**

Love next argues that the prosecutor committed misconduct by asking jurors to put themselves in F.P.'s shoes.

The supreme court has stated that it is improper for a prosecutor to invite jurors to put themselves in the victim's shoes. *State v. Thompson*, 578 N.W.2d 734, 742 (Minn. 1998). The prosecutor in *Thompson* argued that the victim's mother saw "one of the most terrible sights that any mother can see . . . your own daughter being killed right before your eyes." *Id.* (emphasis omitted). The state conceded that the statement was misconduct. *Id.* Similarly, this court has held that it is misconduct for a prosecutor to ask jurors to imagine "[w]hat it must have been like to be in that stairway with your head being held by one person while another assaulted you." *State v. Bashire*, 606 N.W.2d 449, 453-54 (Minn. App. 2000), *rev. denied* (Minn. Mar. 28, 2000).

Again, it is helpful to put the prosecutor's alleged misconduct in context. In the defense closing argument, Love's trial attorney argued that F.P. was not a credible witness because she left out or "embellished" important details while testifying. In rebuttal argument, the prosecutor replied to that argument as follows:

> Look, she didn't have every single, tiny, meticulous detail that
> the Defense asked about . . . . *Think about where you were 853*
> *days ago. . . .* If you can remember where you are, recall the

15

exact time you were there. . . . If you're still with me, stop. Insert your traumatic event that you recall during voir dire. . . . Now that you have your traumatic event in your mind, recall . . . what almost all of you said. You couldn't think clearly. You were in shock. Most of you rely on your instincts to get you through, but you all remember the experience itself. . . . Now, I didn't ask you to tell me the exact event, but I knew in that moment you had it in your mind, you recall the memories that were important to you, and you remember the feelings that were important to you. Those are seared in your memory. (Emphasis added.)

In general, a prosecutor may ask jurors to "bring their own experiences to bear in assessing the credibility of a defendant's claim." *Jones*, 753 N.W.2d at 692 (quotation omitted). More specifically, it is not improper for a prosecutor to ask jurors "to place themselves in the victim's posture as she *testified*, not during the crime," for the purpose of "assist[ing] the jury in assessing [the victim's] credibility." *State v. Rose*, 353 N.W.2d 565, 568 (Minn. App. 1984), *rev. denied* (Minn. Sept. 12, 1984). In this case, the prosecutor did not ask jurors to imagine themselves as the victim of Love's acts or some other criminal act. The prosecutor simply asked jurors to consider the difficulties inherent in recalling specific details of events that occurred long ago and under stressful or traumatic circumstances. Thus, the prosecutor did not engage in plain misconduct.

**E.      Love's Name**

Love next argues that the prosecutor engaged in misconduct by misusing Love's name in her arguments.

In her opening statement, the prosecutor expressly referred to a popular song entitled "What's Love Got to Do with It?" In her closing argument, the prosecutor returned to the theme by saying, at the beginning of her argument: "What's Love got to do with it? Now,

16

you know. Love's got everything to do with it." Love contends that the prosecutor's argument is similar to the argument in *State v. Porter*, 526 N.W.2d 359 (Minn. 1995), in which the prosecutor referred to an imaginary "James Porter School of Sex Education." *Id.* at 363. The supreme court disapproved because the prosecutor's references to the imaginary school "were not based on any evidence produced at trial, nor were they based on any reasonable inference which could be drawn from the evidence produced at trial." *Id.* at 364.

"[P]rosecutors must avoid inflaming the jury's passions and prejudices against the defendant." *State v. Bailey*, 677 N.W.2d 380, 404 (Minn. 2004). "While the state's argument need not be 'colorless,' it must be based on the evidence produced at trial, or the reasonable inferences from that evidence." *Porter*, 526 N.W.2d at 363. We do not equate the prosecutor's rhetorical device in this case with the fabricated and prejudicial comment in *Porter*. It does not appear that the prosecutor's reference to the ordinary meaning of the word "love" was intended to inflame the jurors' passions and prejudices. Thus, the prosecutor did not engage in plain misconduct by referring to the title of a well-known song that includes Love's surname.

F.     **Accuracy of Factual Statements**

Love last argues that the prosecutor engaged in misconduct by misstating the evidence. Specifically, Love challenges statements made by the prosecutor near the end of her closing statement in which she summarized the state's case as follows:

> The Defendant thought he picked the perfect victim. Thought he picked the perfect place, the perfect time. He wasn't counting on the fight that she had in that little body. He

17

was counting on you not believing her. Maybe he thought he could get away with it because she's not perfect. Maybe he thought she wouldn't have the guts to report it. . . . [M]aybe he was counting on the victim being too afraid, too ashamed, too humiliated to testify in front of you. Maybe he thought to himself, [they] will never believe her over me. Tell him by your verdicts in this case, he was wrong to count on that.

Love contends that there was no evidence that he acted in such a calculated way.

In response, the state argues that the prosecutor's comments are inferences that may be drawn from the evidence. We agree. The evidence indicates that Love first established contact with F.P., that he asked her for rides five times, that he invited her to his home on the fifth occasion, that he encouraged her to sleep on his bed, and that he remained in the bedroom throughout the night. Based on this evidence, the prosecutor's comments urged the jury to draw permissible inferences from the evidence presented. *See Roman Nose*, 667 N.W.2d at 402-03. Thus, the prosecutor did not engage in plain misconduct.

## G.     Substantial Rights

We have concluded that the prosecutor engaged in plain misconduct by disparaging defense counsel. Accordingly, we must determine whether that misconduct affected Love's substantial rights. The state bears the burden to prove "there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Portillo*, 998 N.W.2d at 251 (quotations omitted). To determine whether the state has satisfied that burden, "we consider the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions." *Id.* (quotation omitted).

18

It is significant that the plain misconduct we have identified was not pervasive. It was limited to a few comments that were disparaging of defense counsel. It is unlikely that those few comments determined the jury's verdicts. The state contends that the evidence of Love's guilt was strong because F.P. testified about the assault in a manner that was consistent with the statement that she gave to a police officer shortly after the incident. Love contends that the state's case was not strong because it was based solely on F.P.'s testimony and there were no other witnesses and no corroborating physical evidence. We believe that the state's evidence was reasonably strong. The state's case included the testimony of F.P.'s medical providers, who testified about F.P.'s physical and emotional state after the assault, which tended to corroborate F.P.'s testimony. Based on our review of the record, we conclude that the state has shown that "there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (quotations omitted).

Thus, Love is not entitled to a new trial on the ground of prosecutorial misconduct.

### III. Custody Credit

In his *pro se* supplemental brief, Love identifies one alleged error for which he requests relief. He argues that the district court erred by not awarding him custody credit for the time he spent on pre-trial detention wearing an ankle monitor, and he asks this court to award him additional custody credit. The state does not respond to the argument.

In imposing a sentence, a district court must "[s]tate the number of days spent in custody in connection with the offense or behavioral incident being sentenced," which time "must be deducted from the sentence and term of imprisonment." Minn. R. Crim. P. 27.03,

19

subd. 4(B).  In this case, the district court awarded Love 49 days of custody credit.  Love asserts on appeal that he wore an ankle monitor for more than a year.  But at the sentencing hearing, Love did not request additional days of custody credit.

In *State v. Wilkinson*, 539 N.W.2d 249 (Minn. App. 1995), the appellant argued that he was entitled to custody credit for time spent on electronic home monitoring.  *Id.* at 252. This court rejected the argument, reasoning that "electronic monitoring . . . does not constitute 'time spent in custody' for which jail credit should be received" because "there is a substantial difference between [electronic home monitoring] and being placed in custody."  *Id.*

Thus, the district court did not err by not awarding Love additional custody credit for the time he spent before trial wearing an ankle monitor.

**Affirmed.**